### GRAY HOLDING CORP. v. CLAUSON.
No. 182.

United States District Court
D. Maine, S. D.

March 2, 1951.

B. A. Brickley, Charles W. O'Brien, Boston, Mass., Leonard A. Pierce, Jotham D. Pierce and Edward W. Atwood, all of Portland, Me., for plaintiff.

Andrew D. Sharpe, Washington, D. C., Alton A. Lessard, U. S. Atty., Edward J. Harrigan, Asst. U. S. Atty., Portland, Me., for defendant.

CLIFFORD, District Judge.

This is an action for the recovery of $2,854.08, representing income taxes paid by the taxpayer, Gray Holding Corporation, to the defendant, Collector of Internal Revenue for the District of Maine, for the years 1939 and 1940, together with legal interest thereon.

The ground upon which this refund is sought is that the plaintiff corporation was not engaged in business so as to subject its income to taxation and, therefore, that its income was taxable only to its stockholders. The plaintiff contends that it is merely the agent of its stockholders to hold legal title to their stock in Maine and New Hampshire Theatres Company (hereinafter referred to as Theatres Company), and to act as a mere conduit or agent for them in receiving, and immediately transmitting to them, the dividends which each stockholder is entitled to receive on the Theatres Company stock. Plaintiff asserts that its activities throughout its entire history demonstrate its sole purpose to have been the furtherance of the convenience of the stockholders. In short, plaintiff contends that it is not a real corporation for income tax purposes.

On the other hand, the defendant contends that the plaintiff is a real corporation and an entity separate and distinct from its stockholders. Defendant cites the broad corporate purposes stated in plaintiff's charter, and the activities of plaintiff since its incorporation, in support of that contention. The defendant asserts that plaintiff is not the agent, alter ego or conduit of its stockholders, and is not exempt from the corporation income tax.

Theatres Company was incorporated at Lewiston, Maine, August 4, 1919. Since that date it has been engaged in the business of promoting and managing a chain of theatres in Maine, New Hampshire, Massachusetts and Vermont.

One-half of the capital stock issued by Theatres Company was subscribed by Olympia Theatres, Inc., and certain individuals associated with Olympia Theatres, Inc. The other half of the Theatres Company stock was subscribed by six individual investors. Under the By-Laws of Theatres Company, as they were in effect from its inception through the year 1940, each half interest of the stock had the right to select one half of the Board of Directors. The directors chosen by the six individual investors, above referred to, or by the successors in legal title to their stock

in Theatres Company, were designated as "Group A"; while the directors chosen by the holders of the other half of the stock were designated as "Group B". In this opinion, for convenience, the stockholders who elect the Group A directors are referred to as the Group A stockholders, and their stock as the Group A stock.

The By-Laws of Theatres Company also provided that one of the Group A directors should be the President of Theatres Company, and that the Group A directors should have routine control and management of the business and property of Theatres Company, including the appointment of the General Manager. The Group B directors would participate in the election of all officers other than the General Manager, and in decisions of the Board of Directors not relating to the routine management of the business and property. The By-Laws provided that "all matters other than those relating merely to the ordinary conducting of the business shall require the affirmative vote or written approval" of two more than the number of directors in either group alone. Copies of the corporate records of Theatres Company for the years 1926 through 1940, which are in evidence, demonstrate that the scheme of control above outlined was faithfully followed during those years.

On June 1, 1920 the six Group A stockholders joined in executing a trust agreement (the Hislop Trust). That agreement recited that the shares of Theatres Company held by those stockholders were "exactly one-half of the entire outstanding stock of the said Company, which company was organized with the understanding the rights and powers of each combined half ownership should forever remain equal and intact, and the parties hereto desire to protect their several interests by preventing any fraction of said half ownership getting into hands which may defeat said understanding, and for that purpose to cause it to be voted as a unit." The six Group A stockholders transferred their Theatres Company stock to Albert Hislop, one of their number, as Trustee, and directed the officers of Theatres Company to cancel their certificates of stock and

issue to the Trustee, in lieu thereof, one certificate for the entire block of stock. The Trustee then issued to each investor a trustee's receipt for the number of shares of Theatres Company stock so transferred by such investor.

The Hislop Trust agreement provided that the Trustee should "receive the dividends on said stock in his hands and shall immediately upon the receipt of any dividend pay to each of the holders of said trustee's receipts his proportionate part thereof." The agreement further prohibited the transfer or encumbrance of Theatres Company stock by any holder of a trustee's receipt except upon the written consent of the others, and subject to the terms and conditions of the agreement.

The Trustee was instructed as to the manner of voting the stock held by him for "the one-half directorate to which this half interest in the stock of the corporation is entitled." He was also instructed to vote against any change in the equally balanced control of Theatres Company and to vote against any other change in the By-Laws or operation of Theatres Company, unless a majority in interest of the holders of trustee's receipts should first agree to the change.

The trust agreement further provided that "the Directors representing this one-half of the capital stock of said Company shall endeavor, if possible, to vote on all questions alike and by agreement, and on very important matters where the control of the company may be directly or indirectly involved as to management they shall follow the instructions of a majority in interest of the holders of receipts and until they get said consent, they shall vote against changes and to maintain the situation that then exists."

Provision was also made in the Hislop trust agreement for the replacement of the trustee, the disposition of trustee's certificates owned by any holder at his death, and for the termination or renewal of the trust at the end of a five year term.

The records introduced in evidence do not indicate what manner of proceeding followed the expiration of the five year term of the Hislop trust. From all the

facts, however, it is reasonable to infer that the provisions of the trust were continued in effect by agreement until January 1, 1927. On that date the ten persons who were then the Group A stockholders joined in a new trust agreement, the so-called Gray Trust. The provisions of this trust were similar in most respects to those of the Hislop Trust, the principal difference being that the size of the majority vote of the beneficial owners, necessary for approval of any fundamental change in the organization of Theatres Company, was increased from a bare majority in interest to a 90% majority in interest. William P. Gray was named Trustee; and the term of the Gray Trust was stated to be ten years.

Subsequently, a dividend of Theatres Company stock, making no change in the balance of ownership of the Company, was reflected by a proportionate increase in the number of trustees certificates held by each beneficial owner of the Gray Trust. From time to time, by agreement of the beneficial owners of the Group A stock, certain trust receipts were transferred to new owners, among them members of the family of one of the original owners, and other persons, which did not necessitate any change in the record title to the Group A stock on the books of Theatres Company.

Against this background, Gray Holding Corporation, the plaintiff here, was organized on February 12, 1931. The holders of trustee's receipts from the Gray Trust transferred them to the plaintiff, receiving in exchange equivalent amounts of plaintiff's capital stock. Legal title to the Group A stock of Theatres Company was transferred by the Gray Trust to plaintiff; and the Gray Trust was dissolved. This Court finds that the sole reason for the shift to the corporation form was to provide a permanence which was not possible under a trust and to afford a better means of perfecting and carrying out the original purpose of the Group A stockholders to protect their block of stock. There is no suspicion of any attempt to evade lawful taxes by this procedure.

The corporate powers of plaintiff were recited in the incorporation certificate in very general terms. They included powers to purchase, acquire, hold and dispose of any bonds or other securities or evidences of indebtedness or any shares of capital stock created or issued by any other corporation or corporations, association or associations, of any State, territory or country; to exercise all the rights, powers and privileges of ownership of such property held by the plaintiff, including the power to vote any capital stock; to aid in any manner any corporation or association of which any bonds or other securities, or evidence of indebtedness or stock are held by plaintiff, and to do any acts or things designed to protect, preserve, improve or enhance the value of any such property; to purchase, hold, sell, and otherwise deal in its own capital stock, bonds or other obligations, but to use, in effect, only surplus funds of plaintiff for that purpose. Specific powers were included authorizing plaintiff to acquire the trust certificates of the Gray Trust, and to exercise all the rights, powers and privileges of ownership of such certificates. Finally, for the above purposes, plaintiff was empowered to borrow money, to make and perform contracts, and to acquire and hold necessary real and personal property.

Plaintiff has never, in fact, held any capital assets other than the block of the capital stock of Theatres Company representing the Group A interest in that company. Plaintiff has never hired any office space, or owned any office equipment other than its corporate seal and record books. Though plaintiff's by-laws permit its directors to determine the compensation to be paid to any officer or officers, plaintiff has never had any paid officers or employees. Plaintiff has never had its own stationery. It has maintained a small bank account for the purpose of receiving and disbursing dividend money from the Theatres Company stock. All of this money has been promptly paid out to plaintiff's stockholders, except for small amounts reserved and paid out for incorporation expenses, annual state franchise taxes and federal income taxes.

Federal capital stock taxes were paid by plaintiff for several years when that tax

was first in effect; but these were refunded when the Treasury Department ruled that plaintiff was not "carrying on or doing business", within the meaning of the applicable statute, 26 U.S.C.A. Int.Rev.Code, § 1200 since repealed.

The stockholders and directors of plaintiff held regular meetings from the organization of the corporation through the year 1940, of which meetings accurate and complete records were kept. Copies of those records are in evidence. Aside from the business incident to the organization of plaintiff corporation and the taking over of the Theatres Company stock from the Gray Trust, the only business done at such meetings was the periodic election and qualification of plaintiff's officers and directors, and the declaration of dividends, with the sole exception of a vote of the Board of Directors at the meeting of March 9, 1931, which reads as follows: "That the President and Treasurer of this Corporation be authorized to vote said stock of said Maine & New Hampshire Theatres Co., and to represent this Corporation at all meetings of the Stockholders of said Maine & New Hampshire Theatres Co., and to do any and all acts necessary and incident to the voting of said stock, in such manner as may best serve the purposes of the stockholders of this Corporation."

The records of meetings of the stockholders of Theatres Company show that from the inception of plaintiff corporation in 1931, up to and through the year 1940, the Group A stock was voted, and the Group A directors were elected, by the officers of plaintiff rather than directly by the stockholders of plaintiff. The number of plaintiff's stockholders, during the years 1939 and 1940, included twenty individuals and two trusts. From immediately after the organization of plaintiff, through the year 1940, the same man served both as president and clerk of the plaintiff and as president and clerk of Theatres Company, receiving a substantial salary in his capacity as president of Theatres Company.

The tax on corporate incomes is imposed by section 13(b) of the Internal Revenue Code, 26 U.S.C.A. § 13(b), the pertinent parts of which are as follows: "13. * * *

"(b) Imposition of Tax.—There shall be levied, collected, and paid for each taxable year upon the net income of every corporation the net income of which is more than $25,000 * * * a tax computed under subsection (c) of this section or a tax computed under subsection (d) of this section, whichever tax is the lesser."

It will be noted that the quoted words of the statute are not limited by any requirement that a corporation must be doing business in order to make the tax applicable. Plaintiff does not assert that it falls within any of the classes of corporations which are exempt from income taxes under the provisions of section 101 of the Internal Revenue Code, 26 U.S.C.A. § 101.

The issue presented here is whether plaintiff falls within any judicially recognized exception to the words of the taxing statute.

 It may be stated as a general rule that, for tax as well as other purposes, a corporation is an entity separate and distinct from its stockholders. Dalton v. Bowers, 1932, 287 U.S. 404, 53 S.Ct. 205, 77 L.Ed. 389; Groves v. Commissioner of Internal Revenue, 4 Cir., 1938, 99 F.2d 179. But it has frequently been held that the technical separateness of a corporation and its stockholders may be disregarded in the assessment of income taxes, especially where the stock is closely held and there is little or no distinction in actuality between the corporation and the holders of its stock. This line of reasoning was followed by the United States Supreme Court in Higgins v. Smith, 1940, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, where the loss from the transfer of assets by an individual taxpayer to his wholly-owned corporation was disallowed on the ground that there was not enough substance to the sale to establish a loss. In several cases since Higgins v. Smith it has been held that, when a corporation has been formed merely as an agency to hold title for the convenience of the owner, and has served this purpose with little or no independent

activity on its part, the Commissioner of Internal Revenue may regard the property and the income therefrom as belonging to the stockholder. Griffiths v. Helvering, Commissioner of Internal Revenue, 1939, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Corliss v. Bowers, 1930, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916. See Seattle Hardware Co. v. Squire, D.C.W.D. Wash. 1948, 83 F. Supp. 106, affirmed 9 Cir., 1950, 181 F.2d 188.

The Court in Higgins v. Smith, supra, while taking the view that the government is not bound by the taxpayer's choice of the corporate device, but may look behind the form to the substance of the factual situation, stated that the taxpayer is bound by the corporate form of his choice. 308 U.S. at page 477, 60 S.Ct. 355. A similar view is expressed in Moline Properties, Inc., v. Commissioner of Internal Revenue, 1943, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 87 L.Ed. 1499, and in O'Neill v. Commissioner of Internal Revenue, 2 Cir., 1948, 170 F.2d 596.

Plaintiff rests its case on the similarity of the present facts to the facts in several other cases, where taxpayers have been permitted to assert the true situation behind their use of a corporation to hold title to property, and courts have held that the corporation was not subject to a corporate income tax. In those cases, wholly-owned corporations, formed for a purpose other than tax evasion, had actually performed no function beyond the holding of legal title to real property, and all of the incidents and liabilities of ownership of the property had fallen directly to the beneficial owners of the property. Paymer v. Commissioner of Internal Revenue, 2 Cir., 1945, 150 F.2d 334 (corporation formed to put legal title beyond reach of a creditor); United States v. Brager Bldg. & Land Corp., 4 Cir., 1941, 124 F.2d 349 (corporation formed to hold title and avoid necessity of partition of property if one of partner-owners should die); North Jersey Title Ins. Co. v. Commissioner of Internal Revenue, 3 Cir., 1936, 84 F.2d 898 (corporation formed to hold title

to property which parent company was not legally permitted to hold); and 112 West 59th Street Corp. v. Helvering, 1933, 62 App.D.C. 350, 68 F.2d 397 (corporation formed to hold and convey title during absence of legal owner from the country).

It may be, as plaintiff asserts, that this case is near enough on its facts to come within the rule of the cases which plaintiff cites. That is a question which this Court considers it unnecessary to decide, in view of the fact that the United States Supreme Court, in Moline Properties, Inc., v. Commissioner of Internal Revenue, 1943, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499, has laid down the rule of law which, in the opinion of this Court, is determinative of the question in this case.

In the Moline Properties case, a corporation had been organized by the owner of real estate, at the suggestion of a mortgagee of the property, in order to afford the mortgagee security for a further loan on the property. The owner transferred the property to the corporation. The capital stock of the corporation was issued to the individual owner and turned over by him to a trustee nominated by the mortgagee. The trustee held the stock until the mortgages were paid, and then returned it to the individual owner. Thereafter, the corporation defended a condemnation action and began and prosecuted an equity proceeding involving the property, and executed a lease of part of the property. The individual owner and sole stockholder arranged the sale of the property in question, and received the proceeds of sale directly from the purchaser. The Commissioner of Internal Revenue assessed an income tax against the corporation on the profits from the sale. The Board of Tax Appeals, 45 B.T.A. 647, held for the taxpayer, but the Court of Appeals reversed, 5 Cir., 131 F.2d 388. The Supreme Court ruled that the corporate form could not be disregarded, and upheld the judgment for the Commissioner.

The Moline Properties case is clearly distinguishable from the present case on its facts; but it is important to note that the Supreme Court granted certiorari in that case "because of the volume of sim-

934

ilar litigation in the lower courts and because of alleged conflict of the decision below with other circuit court decisions." 319 U.S. at page 437, 63 S.Ct. at page 1133. A footnote to this statement cites, among other cases, three of the cases on which plaintiff relies here—namely, 112 West 59th Street Corp. v. Helvering, supra; United States v. Brager Building & Land Corp., supra; and North Jersey Title Ins. Co. v. Commissioner of Internal Revenue, supra. (The decision in Paymer v. Commissioner, on which plaintiff also relies, was delivered after the Moline Properties case came down.)

It seems clear that in framing the language of its opinion in the Moline Properties case, the Supreme Court was considering the decisions and the logic of the cited cases with which the lower court's decision had allegedly been in conflict. With this in mind, the words of the Court are significant in the instant case. In holding that a wholly-owned corporation was not exempt from the corporation income tax on the ground that it had performed business of only a minor nature, the Court said, 319 U.S. at pages 438, 439, 63 S.Ct. at page 1134: "The doctrine of corporate entity fills a useful purpose in business life. *Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity* or is followed by the carrying on of business by the corporation, *the corporation remains a separate taxable entity*." (Emphasis added.)

This Court understands the foregoing words to cover the present case, and foreclose any exemption from income taxes for a corporation which serves any useful business purpose.

In the Moline Properties case, 319 U.S. at page 439, 63 S.Ct. at page 1134; the Court goes on to say, "The petitioner corporation was created by Thompson [the sole stockholder] for his advantage and had a special function from its inception." Again, after observing the particular busi-

ness activities in which the corporation had, in fact, engaged, the Court states, 319 U.S. at page 440, 63 S.Ct. at page 1134, "Business necessity * * * made petitioner's creation advantageous to Thompson." The quoted language applies with equal force to the case at bar. Business necessity, that is, the protection and preservation of the voting status of the Group A stockholders of Theatres Company, with the resulting financial security which that protection could give, as well as the convenience of those stockholders, made the creation of plaintiff corporation advantageous to them, both individually and as a class.

Further light is shed on the scope of the "business purpose" concept, referred to in the Moline Properties case, by several cases dealing with the question whether a trust should be considered an "association". The definition of the term "corporation", in section 3797(a) (3) of the Internal Revenue Code, 26 U.S.C.A. § 3797(a) (3), includes the term "association"; and, therefore, an association is subject to the corporation income tax. For purposes of that tax, an association would not be taxed more strictly than a true corporation, all other facts being equal. If the corporation income tax would not be applied to a corporation, because the corporate form was to be disregarded, in the absence of a business purpose, then the same tax would not be imposed against an association on the same state of facts. Therefore, the tests which have been applied by the Court, in deciding whether a trust with the other attributes of an association had a business purpose, making it taxable as an association, are helpful in determining whether a corporation has a business purpose, making the corporation subject to the tax.

In Coleman-Gilbert Associates v. C. I. R., 1 Cir, 1935, 76 F.2d 191, the Court ruled that whether a trust had a "business purpose" was to be determined by the actual reasons motivating its establishment, without reference to powers given to the trustee by the trust instrument but not exercised by him. The Court said, 76 F.2d at page 194, "That it is not what the trustees are authorized to do under the

trust instrument, but what they actually are doing", which controls. This position is analogous with the contentions of the plaintiff here. Applying that test, the Court found no tax was due. The Supreme Court reversed that holding, and found that the trust was a taxable association. Helvering v. Coleman-Gilbert Associates, 1936, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278. The Supreme Court stated, 296 U.S. at page 374, 56 S.Ct. at page 287, that the parties to a trust are "not at liberty to say that their purpose was * * * narrower than that which they formally set forth in the instrument under which their activities were conducted." The Court of Appeals for the First Circuit applied the latter rule in the subsequent case of Sears v. Hassett, 1940, 111 F.2d 961, using the following words, 111 F.2d at pages 962–963: "However the character of the trust as an association is not determined by the intentions or expectations of its creators, proved by parol, nor by the extent to which the powers in the trust instrument have actually been exercised, but rather by the *purposes and potential activities as disclosed on the face of the trust instrument.*" (Emphasis supplied.) See Reynolds v. Hill, 8 Cir., 1950, 184 F.2d 294, and Nee v. Main Street Bank, 8 Cir., 1949, 174 F.2d 425. The corporate powers of the plaintiff must pass the same test if plaintiff is to escape the impact of the tax.

It may be noted, in passing, that the Court of Appeals, in Sears v. Hassett, supra, not only found the trust in question subject to a corporation income tax, but went on to rule that the trust was not "doing business", so as to be subject to the capital stock tax. The Court distinguishes the two types of tax in speaking as follows of the capital stock tax, 111 F.2d at page 964: "This is an excise tax not on the *privilege* of doing business during the year but 'with respect to carrying on or doing business for any part of such year'". Sears v. Hassett is authority not only for the proposition that an organization may be subject to the corporation income tax and yet be exempt from the capital stock tax, but also for the principle that an or-

ganization may be subject to the corporation income tax even though it is not doing business.

■ In the opinion of this Court, plaintiff corporation was formed for a "business purpose", in that its creators had in mind the protection of the status of the Group A stock in the control of Theatres Company, by eliminating any risk that a fraction of the Group A stock could ever shift into the hands of the owners of the Group B stock. Any such shift of Group A stock would have reduced the remaining Group A stock to a minority status and might have substantially impaired its value. The existence of plaintiff corporation prevented such a result. The fundamental reason for the corporation's existence was a purpose which was "the equivalent of business activity", within the words of Moline Properties, Inc., v. Commissioner of Internal Revenue, supra, 319 U.S. at pages 438–439, 63 S.Ct. at page 1134, previously quoted.

Furthermore, plaintiff has the privilege, without making any change in the corporate powers recited in its certificate of incorporation,[1] of engaging in a general investment business or even in the business of managing other corporate enterprises of any sort. Applying to this case the rule laid down by the Supreme Court in Helvering v. Coleman-Gilbert Associates, supra, and followed in Sears v. Hassett, supra, plaintiff's broad though unexercised, corporate powers are alone sufficient to subject plaintiff to the corporate income tax, without considering the impact of the Moline Properties case.

Either of the above conclusions, as this Court understands the law, requires a finding that plaintiff is an entity subject to the burden of the corporation income tax. This Court is constrained to reach that result notwithstanding the fact that it permits a double taxation of the income from the stock of Theatres Company, first when the income reaches the plaintiff, and again when it is paid to the beneficial owners of that stock. That is the price which the owners are required to pay, un-

1. These powers are summarized supra, 95 F. Supp. 931.

der our law, for the protection which plaintiff's existence gives them.

An order may be submitted, giving judgment for the defendant, in accordance with this opinion, without costs.