W. Bladen **LOWNDES** and Anne W.
Lowndes, Plaintiffs,

v.

**UNITED STATES** of America,
Defendant.

**Civ. A. No. 15991.**

United States District Court
D. Maryland.

Sept. 16, 1966.

P. McEvoy Cromwell, Baltimore, Md.,
(John D. Wright, and Wright, Robertson
& Dowell, Baltimore, Md., on brief), for
plaintiffs.

Moshe Schuldinger, Atty., Dept. of
Justice, Washington, D. C. (C. Moxley
Featherston, Acting Asst. Atty. Gen.,
David A. Wilson, Jr., Atty. Dept. of
Justice, Washington, D. C., Thomas J.
Kenney, U. S. Atty., and Robert W. Ker-

nan, First Asst. U. S. Atty., Baltimore, Md., on brief), for defendant.

WINTER, Circuit Judge (by designation):

This suit for refund of income taxes raises the questions of whether plaintiff Anne W. Lowndes received income taxable as long term capital gains or as ordinary income on the dates that four corporations, all of the issued and outstanding stock of which she had acquired, were liquidated and assets distributed, or whether she received income taxable as ordinary income on the dates that she acquired the stock of those corporations. Suit was filed by her and her husband because they filed joint income tax returns for the years in question. The transactions by which she acquired the stock were conducted in her name, but were negotiated by her husband; her only participation was to execute various documents to carry out the transactions which he arranged.

■ Concerned are the tax years 1957, 1959 and 1960. In 1957 Mrs. Lowndes acquired all of the outstanding stock of two corporations which were liquidated later in that year, but six months after the date of acquisition of stock. In 1959 Mrs. Lowndes acquired all of the outstanding stock of two more corporations, which were liquidated in 1960, again six months after the date of acquisition of stock. She and Mr. Lowndes treated the gains which she realized as long term capital gains, realized on the respective

dates of liquidation. The Commissioner, however, treated the gains as ordinary income, realized on the dates of stock acquisition, or alternatively on the dates of liquidation, and assessed additional income taxes with interest thereon.[1] It is stipulated that all of the additional assessments have been paid in full, demand for repayment refused, and the jurisdiction of this Court under 28 U.S.C.A. § 1346(a) (1) properly invoked. The parties have further stipulated that if plaintiffs are entitled to judgment, they will agree upon the amount of judgment to be entered.[2]

The stock of all four corporations was acquired from subsidiaries of three subsidiaries of Bethlehem Steel Company, viz., Bethlehem Steel Company, Bethlehem-Cuba Iron Mines Company and Bethlehem Limestone Company (hereinafter individually as well as collectively called "Bethlehem"). The stock acquired in 1957 was that of American Well and Prospecting Company (hereinafter called "American Well") and Bethlehem Quarry Company (hereinafter called "Bethlehem Quarry"). The 1959 acquisitions were the stock of Indian Coal Company (hereinafter called "Indian Coal") and Maryland Century Coal Company (hereinafter called "Maryland Century"). The acquisitions came about when Bethlehem, which had theretofore acquired these companies but had ceased to operate them for a number of years,[3] decided to dispose of them because they were no longer useful to Bethlehem and Bethlehem de-

1. The assessments, including interest, were $8,195.20 for 1957; $14,256.25 for 1959; and $6,927.71 for 1960. The 1957 and 1959 assessments were made on the theory that Mrs. Lowndes realized ordinary income in those years upon the acquisition of the stock. The assessment for 1960 was made on the alternative theory that Mrs. Lowndes received ordinary income in the year the corporations whose stock was acquired in 1959 were liquidated.

2. Irrespective of how the main points in issue are decided, taxpayers will be entitled to some refund. If it is held that Mrs. Lowndes is entitled to capital gains treatment, taxpayers will be entitled to a refund of the assessments for all years.

If it is held that Mrs. Lowndes is entitled to ordinary income treatment she will be entitled to a refund of the 1959 or 1960 assessment, depending upon the determination of the year in which ordinary income is deemed to have been realized. Whatever the resultant figure taxpayers are entitled to interest to the date of judgment.

3. American Well had been engaged in the manufacture of pumps. It ceased business in the "early 50's." Bethlehem Quarry, Indian Coal and Maryland Century were coal mining corporations. Again in the early 50's they had ceased active operations and their properties or leases disposed of or allowed to expire.

sired to simplify its corporate structure. Bethlehem caused all of their assets to be reduced to cash and paid all of their liabilities, including liabilities for taxes. Bethlehem had a loss in each of the companies but, by a quirk in the federal income tax laws, Bethlehem could gain no tax advantage from its loss if it undertook to dissolve the corporations and distribute the cash, which was in the form of bank accounts, to itself. Rather, Bethlehem was obliged, if it was to realize a loss for tax purposes, to sell the stock in an arm's length transaction to a third party. The only condition Bethlehem imposed on such sales was that they be for a price agreeable to it, payable in cash.

The sale of the stock of American Well is typical of each of the four transactions. By bill of sale dated April 17, 1957 Bethlehem sold all of the stock of American Well (1,000 shares) to Mrs. Lowndes at and for the price of $93,000.00. At the time of the sale American Well's sole net asset was a bank account in the amount of $100,000.00; it had no liabilities; and Bethlehem warranted that it had no tax or contingent liabilities. Immediately prior to the sale, American Well closed out its checking account theretofore existing and opened a new checking account at the Union Trust Company of Maryland (hereinafter called "Union Trust"). This was done in conformity with one of the conditions fixed by Union Trust for making a loan to Mrs. Lowndes. On April 17, 1957, Mrs. Lowndes borrowed $93,000.00 from Union Trust on her demand note bearing interest at 4½% and pledged as security for the loan the 1,000 shares of American Well. Simultaneously, the theretofore officers and directors of American Well resigned, Mr. and Mrs. Lowndes and another person were elected as directors, and Mr. and Mrs. Lowndes were elected officers of American Well, as well as two individuals who were also officers of Union Trust.

American Well adopted bank resolutions which limited withdrawals from its checking account at Union Trust to checks signed by Mr. or Mrs. Lowndes *and* one of the two individuals who was an officer of Union Trust. On the same date American Well instructed Union Trust to convert the checking accounts to time deposit accounts for a six month period bearing interest at 2½%, representing that it would make no withdrawals for a period of six months.[4]

On October 22, 1957 Mrs. Lowndes, as the sole stockholder of American Well, instructed its board of directors to liquidate and dissolve the company and distribute its assets to her. A partial liquidating dividend of $99,000.00 was paid October 24, 1957. A final liquidating dividend was paid after November 1, 1957. Payment of the Union Trust loan was accomplished by use of the time deposit of American Well. For the year 1957 American Well reported and paid income tax on the interest earned on the time deposit and, for the same year, taxpayers claimed a tax deduction for the interest paid by Mrs. Lowndes to Union Trust on the loan.

The transactions in regard to the three other companies were identical. The stock of Bethlehem Quarry, consisting of 1,709 shares, was also acquired April 17, 1957. The purchase price was $169,789.-15. Bethlehem Quarry had no liabilities, except a reserve for federal income tax in the amount of $2,534.00, and its sole asset was cash in bank in the amount of $179,-346.00. Mrs. Lowndes borrowed $169,-789.15 from Union Trust on a 4½% demand note, secured by a pledge of 1,709 shares of Bethlehem Quarry. New directors and officers were elected for Bethlehem Quarry. Shortly before settlement, Bethlehem Quarry had theretofore established a new demand account at Union Trust; it adopted new bank resolutions limiting the persons who could sign on the checking account to Mr. or Mrs.

---

4. In the case of American Well and Bethlehem Quarry the written instructions to Union Trust are not in evidence. In the case of Indian Coal and Maryland Century the written instructions were put in evidence. These instructions were signed by Mr. Lowndes and one of the officers of Union Trust who had been elected an officer of each.

Lowndes and one of the bank officers; and on the date of settlement with Mrs. Lowndes converted the checking account to a time account bearing interest at 2½%, again representing that there would be no withdrawals for six months. On October 22, Mrs. Lowndes directed Bethlehem Quarry's board of directors to liquidate and dissolve that company and to distribute its assets to her. A partial liquidating dividend, in the amount of $179,000.00, was paid October 24, 1957 and, on November 1, 1957, a final liquidating dividend was authorized. Payment of Mrs. Lowndes' loan from Union Trust was made from funds from Bethlehem Quarry's time deposit. No additional distribution was made to Mrs. Lowndes, because there were insufficient funds to pay the expenses incident to liquidation and dissolution of Bethlehem Quarry, so that Mrs. Lowndes refunded $947.35 to Bethlehem Quarry, thus reducing the total net liquidating proceeds received by her to $178,052.65. For 1957 Bethlehem Quarry reported as taxable income the interest earned on its time deposit and paid the tax thereon. Taxpayers claimed as a tax deduction the interest Mrs. Lowndes paid on the loan from Union Trust.

From the standpoint of Bethlehem and the taxpayers these transactions were so satisfactory that, in 1959, when Bethlehem undertook to sell 1,000 shares of Indian Coal, which had no liabilities and a single asset of $100,000.00 cash in bank, and 3,000 shares of Maryland Century, which had no liabilities and a single asset of cash in bank of $300,000.00, Mrs. Lowndes undertook to buy them for $95,-500.00 and $286,500.00, respectively. Again, prior to settlement, these companies closed their existing bank accounts, opened demand accounts at Union Trust and deposited all their funds therein; Mrs. Lowndes borrowed the purchase prices in full from Union Trust on demand notes bearing interest at 5%; new officers and directors were elected; new bank resolutions adopted restricting signatories on the account to Mr. or Mrs. Lowndes *and* a bank officer; and Indian Coal and Maryland Century gave Union Trust written instructions to convert the demand accounts to time accounts bearing interest at 3%, representing that no withdrawals would be made for six months. On May 26, 1960 Mrs. Lowndes, as the sole stockholder of Indian Coal and Maryland Century, instructed the directors thereof to liquidate the companies and distribute their assets to her. Liquidating dividends were paid her on May 26, 1960 and June 6, 1960. Mrs. Lowndes' loans from Union Trust were repaid from corporate funds. Mr. and Mrs. Lowndes claimed as tax deductions the interest paid by Mrs. Lowndes to Union Trust on the latter two loans, and both corporations paid income tax on their interest income.

Other than the testimony which established that the transactions between Bethlehem and Mrs. Lowndes were negotiated at arm's length, the only testimony offered was that of Mr. Lowndes, who testified by deposition. He testified that when he had learned that Bethlehem " * * * had a couple of corporations that they wanted to liquidate for sale" and inquired "whether or not I would be interested in buying them," he went to see "Charlie Hoff, who was President of the Union Trust Company at that time." Mr. Hoff agreed to lend the money for Mrs. Lowndes to purchase the stock on condition that the loan be in existence for six months, so that the bank "would have a chance to make some money off of it," that the bank accounts be converted into six month certificates of deposit,[5] and that two of his officers would be officers of the corporation. According to Mr. Lowndes, "in other words, what he was doing was locking us in. You can see what I mean. We couldn't touch any of the money without one of his officers signing the withdrawal."

Mr. Hoff also required Mrs. Lowndes to require the companies she was about

---

5. The instructions to Union Trust from Indian Coal and Maryland Century spoke of placing their accounts on a "time deposit basis." A certificate of deposit is a species of time deposit.

to purchase to move their accounts to Union Trust a week or so before settlement in order to collect funds.

When first questioned, Mr. Lowndes claimed that he went to Union Trust because he didn't know how else to finance the purchase. He claimed that it "never occurred to me" to finance the purchases out of the bank accounts of the corporations whose stock was being purchased. He also claimed that the reason why financing of this type never occurred to him was because "I was thinking about putting the money to work. I wanted to put the money to work." He explained that "putting the money to work" meant converting it into a certificate of deposit which earned interest. *Mr. Lowndes was unequivocal that he never had any thought of reactivating the business of any of the four companies,* and he reiterated that he did not consider liquidating the corporations on the days of settlement, because he wanted to put the money to work in the form of certificates of deposit. He admitted that when the corporations were ultimately liquidated the funds derived from them were used to repay the Union Trust loans made by Mrs. Lowndes which had been created to purchase the stock. Because of the restrictive bank resolutions, this must have been done with the acquiescence of Union Trust.

On cross examination, Mr. Lowndes disclaimed that Bethlehem imposed any restrictions on what might be done with the corporations after Mrs. Lowndes purchased their stock. Mr. Lowndes claimed that the moneys on deposit at Union Trust in a demand account were converted to a time account *at the instance of the bank,* although from his other testimony, this condition was not unacceptable to him. He admitted that he was aware that a taxpayer could obtain more favorable tax treatment of the sale of securities which he held for more than six months. Indeed, as an officer of two banks and one business corporation, as well as a director of another bank and four other business corporations, Mr. Lowndes could be presumed to have a reasonable familiarity with the long term capital gains provisions of the Federal Income Tax laws. When asked if the rule regarding taxation of long term capital gains did not make it more beneficial for Mrs. Lowndes to defer liquidation of the corporations, all of the stock of which she had purchased from Bethlehem, his initial reply was, "I had no need for the money at that time." When pressed, Mr. Lowndes finally admitted that "one of the reasons" why the corporations were not liquidated immediately was to gain the benefit of capital gains treatment of the income realized by Mrs. Lowndes. He then added that it was Union Trust which had insisted that the loan made by Mrs. Lowndes exist for six months, and that Union Trust wanted the use of the money on deposit for at least that period.

Taxpayers argue that Mrs. Lowndes did not receive income taxable as ordinary income on April 17, 1957, when she acquired the stock of American Well and Bethlehem Quarry, and on November 23, 1959, when she acquired the stock of Indian Coal and Maryland Century, Their argument is two-fold. First, they argue that the existence of these corporate entities insulated Mrs. Lowndes from tax liability until the dates of liquidation thereof. Second, they argue that even if these entities are disregarded, Mrs. Lowndes acquired only bank accounts, a species of capital asset.[6] The government argues vigorously to the contrary.[7] This Court need not decide the asserted second legal question because, if the corporate entities are disregarded, as a matter of fact Mrs. Lowndes purchased cash. Prior to the closing of each of the transactions involving these cor-

6. Citing: Perkins v. Commissioner of Internal Revenue, 41 B.T.A. 1225 (1940), aff'd, 125 F.2d 150 (6 Cir. 1942); Rieger v. Commissioner of Internal Revenue, 139 F.2d 618 (6 Cir. 1943); Toye v. United States, 157 F.Supp. 123 (D.C. La.1957).

7. Citing: Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955).

porations, the corporations, at the instance of Mrs. Lowndes (whom Mr. Lowndes claims was so directed by Union Trust), closed their respective bank accounts in the banks in which they had theretofore existed and opened new accounts at Union Trust. Of course, in modern day banking practice this transaction was accomplished by a transfer of credits reflected in a series of bookkeeping operations by a clearing house, correspondent bank or federal reserve bank; but in fact and in law, the withdrawal of funds from one bank and redeposit in another constitutes a conversion of credits in the first bank into cash and deposit of the cash thus obtained in the second bank. More significantly, once the accounts had been opened at Union Trust they were again converted into cash *on the very date that control of them was obtained by Mrs. Lowndes.* Union Trust was instructed to convert demand accounts to a "time deposit basis." Again in modern banking practice, Union Trust would achieve this by an internal bookkeeping operation, but legally the effect of the bookkeeping entries was to constitute a withdrawal of cash from a demand account and a redeposit in a time account or, alternatively, a cash purchase of a certificate of deposit.

Thus, the determinative question is whether, under the facts and circumstances established by the evidence and applicable rules of law, the corporate entities should be disregarded for income tax purposes.

█ Ordinarily an individual and a corporation are for purposes of taxation separate juridical entities. The fact that Mrs. Lowndes owned all of the stock of each of the four corporations, standing alone, is irrelevant.[8] Disregard of a corporate entity for purposes of taxation has been approved, however, on at least two distinct reciprocal grounds. In New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934), the Court recognized that disregard of the corporate entity is the exception, rather than the rule, but stated that disregard is proper where failure to disregard " * * * otherwise would present an obstacle to the due protection or enforcement of public or private rights." Id. p. 442, 54 S.Ct. p. 791. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1934), is another example of the application of the rule stated in the New Colonial Ice case, but is important also for articulation of the doctrine that the presence of a motive to avoid taxes is not sufficient basis to justify disregarding a corporate entity if there is also a business purpose for the entity. Id. p. 469, 55 S.Ct. 266.

█ While the New Colonial Ice case stated a reason for disregard of a corporate entity in negative terms, Moline Properties, Inc. v. Commissioner of Internal Revenue, 319 U.S. 463, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), enunciated the affirmative test that a corporate entity should be recognized for tax purposes so long as the purpose of its being " * * is the equivalent of business activity or is followed by the carrying on of business by the corporation * * *." Id. pp. 438–439, 63 S.Ct. p. 1134. Absent such a

---

8. Southern Pacific Co. v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142 (1918) and Gulf Oil Corp. v. Lewellyn, 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133 (1918) contained strong suggestions that the mere fact that a stockholder owned all of the outstanding voting stock of a corporation, standing alone, was a sufficient basis on which to treat the corporation and its owner as a single entity for tax purposes. Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940), seems to have applied a like rule. But that doctrine was discredited in National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 429, 69 S.Ct. 736, 93 L.Ed. 779 (1949).

A decision in this circuit, United States v. Brager Bldg. & Land Corp., 124 F.2d 349 (4 Cir. 1941), appears to rest in part on this now discredited doctrine. The case was decided before the National Carbide case and has been considered by at least one district court to be no longer persuasive authority. Gray Holding Corp. v. Clauson, 95 F.Supp. 928 (D.Me.1951).

"business purpose," a corporate entity may be disregarded. Shaw Construction Co. v. C. I. R., 323 F.2d 316 (9 Cir. 1963); Paymer v. C. I. R., 150 F.2d 334 (2 Cir. 1945); North Jersey Title Ins. Co. v. C. I. R., 84 F.2d 898 (3 Cir. 1936); Love v. United States, 96 F.Supp. 919, 119 Ct. Cl. 384 (1951).

Another line of Supreme Court cases, overlapping in part those to which reference has already been made, must also be considered. The starting point of this line is Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), which firmly established the doctrine that the incidence of taxation depends upon the substance of a transaction and not upon its form. "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Id. p. 334, 65 S.Ct. p. 708. Gregory v. Helvering, supra; Helvering v. F & R Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939); Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed. 2d 743 (1958); and Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed. 2d 128 (1960) are all to the same effect, as is the pre-*Court* decision of Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L. Ed.2d 916 (1930).

Taxpayers do not dispute the validity of these authorities, but argue most strenuously, that the substance of Mrs. Lowndes' transaction was a bona fide long term capital gains transaction, because she held her investment in each corporation for six months before causing each corporation's cash to be distributed to her, and that for a period of six months after Mrs. Lowndes' acquisition of their stock, each of the corporations had a business purpose, i. e., investment of its funds in income-producing time deposit certificates, with partial control thereof vested in outsiders. While superficially appealing, these arguments do not withstand close scrutiny.

In the ownership of Bethlehem, each of the corporations lacked any remaining business purpose. Bethlehem's sole motive in disposing of them was to dispose of them under the most favorable tax circumstances to Bethlehem. As previously mentioned, Mr. Londes was candid in admitting that he had no thought of reactivating any corporate purpose of any one of them and, in fact, they engaged in no business enterprise except to place cash which they owned on a time deposit interest bearing basis. Business purpose, if any, must exist in earning interest on corporate funds.

It is difficult to believe that Union Trust would insist that cash in its bank be retained on an interest bearing basis where retention of the cash would cost Union Trust an interest expense, particularly when Union Trust had an effective veto over any withdrawal from a non-interest bearing demand account. But such is the testimony of Mr. Lowndes; Mr. Hoff who is said to have exacted this condition is deceased; and no other representative of Union Trust testified in corroboration or contradiction of Mr. Lowndes. If Mr. Lowndes is believed, the conclusion, nevertheless, follows that the investment of corporate funds was not a business purpose of any one of the four corporations Mrs. Lowndes controlled, but was a condition precedent to the making of a loan for the accommodation of Mrs. Lowndes, exacted from each of the corporations. This asserted business activity of the corporations after their stock was purchased is purely illusory.[9]

---

9. Lack of business purpose is more usually found when a corporation is initially organized solely as a tax saving device. A purchase of an existing corporation which has outlived its nontaxsaving business purposes is closely akin to formation of a new corporation having no legitimate function since it lacks business purpose during the entire time it is owned by the purchaser. At least one reported case has disregarded the corporate entity where an original business purpose has ceased to exist, even in the hands of the original owner. Haberman Farms, Inc. v. United States, 305 F.2d 787 (8 Cir. 1962).

More broadly considered, Mrs. Lowndes' transactions were nothing more than the immediate purchase of cash at a discount. That the bank accounts were converted to cash twice as part of the transactions has been shown. While the fact that Mrs. Lowndes could have financed the purchases by immediate liquidation and dissolution of the corporations and use of their funds is not conclusive, it is a fact which sheds much light on the true nature of the transaction, because when liquidation and dissolution were ultimately effected, the record shows that it was the funds of the corporations which were employed to repay Union Trust and not separate funds of Mrs. Lowndes. What, then, was the purpose of investing the corporations' funds in interest bearing time deposits? If not to serve a business purpose of Union Trust, as previously discussed, the inevitable answer is that the purpose was to reduce the effective interest cost to Mrs. Lowndes of the loans made her by Union Trust, even below the partial reduction achieved by her in claiming the interest as deductions in her joint income tax returns. The manner in which the transactions were carried out and the means by which the Union Trust loans were repaid lead the Court to conclude that, although formally cast in other forms, Mrs. Lowndes purchased cash, at a discount, paying for it with the cash she had purchased, and incurring only a theoretical liability on the notes to Union Trust she made, because those notes in turn were secured by the very cash which had been purchased. It was her ability to treat the cash as her own on the date of purchase that enabled her to effect the purchase. Delay in full realization of the fruits of the purchases for six months cannot be justified by any discernible business reason. Thus, the substance of the transaction was that Mrs. Lowndes realized income on the two dates that she purchased all of the stock of the four corporations, and that income should be taxed to her as ordinary income on those dates.

Counsel may agree upon the amount of judgment to be entered.