**NORTH JERSEY TITLE INS. CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 6032.

Circuit Court of Appeals, Third Circuit.

June 30, 1936.

Louis E. Spiegler, and N. Norman Mayer, both of Washington, D. C., for petitioners.

Robert H. Jackson, Asst. Atty. Gen., Sewall Key, John M. Hudson, and Francis I. Howley, Sp. Assts. to the Atty. Gen., for respondent.

Before BUFFINGTON, Circuit Judge, and DICKINSON and FORMAN, District Judges.

FORMAN, District Judge.

The North Jersey Title Insurance Company was organized as an insurance corporation under the laws of the state of New Jersey. In the operation of its business prior to 1923 it made numerous loans on the properties of two corporations, the Mountain Lakes and Oak Ridge companies. Through a fraudulent combination of engineers, surveyors, insurance agents, and others, the insurance company had invested some $400,000 in mortgages on properties of the said real estate companies which were represented to be improved properties but turned out to be vacant lots. The fraud was discovered in 1923. To protect its interests the insurance company forced the Mountain Lakes and Oak Ridge companies into receivership.

The receiver liquidated these companies by selling their properties. The executive committee and some of the officers of the insurance company, during May of 1923, organized the Belhall Company as a vehicle wherewith it should acquire and deal with

the said properties for the insurance company. The insurance company resorted to this expedient because disastrous results were predicted to the title insurance business in the state of New Jersey if publicity was given to the fact that titles had been insured on buildings that never existed, and had other reasons for not desiring to take title in its own name.

The capital stock of the Belhall Company consisted of 14 shares of a par value of $100 each. These were all held by stockholders of the insurance company, with the exception of one share held by an individual so as to qualify him as a resident vice president to sign papers on the premises at Mountain Lakes. On November 5, 1924, the stockholders of the Belhall Company executed an agreement whereby their stock was deposited with the insurance company to be held by it in trust. Later, all of these shares were transferred unqualifiedly to the insurance company. During the years 1924 to 1929, inclusive, the Belhall Company had no paid officers and no paid employees, except a Mr. Kibbie, and an assistant in its office. When the company needed money, the insurance company provided it without interest. There was no thought in the minds of the stockholders of the Belhall Company to profit by its holdings in the said company, and they received no pecuniary benefit therefrom. Separate books were kept for the Belhall Company and the insurance company so as to show the operations of these companies separately, and for the further reason that the assets of the Belhall Company could not be carried on the books of the insurance company which controlled the operations and did all the work for the Belhall Company without charge.

The insurance company regarded the Belhall Company as a real estate department of its own organization, and during the years 1924 to 1929 the income or losses of the Belhall Company were considered as part of the income or losses of the insurance company.

During the years involved, the insurance company filed income tax returns including losses or income of the Belhall Company. The Commissioner of Internal Revenue held that the Belhall Company and the North Jersey Title Insurance Company were not affiliated during the years 1924 to 1929, inclusive, and that the income or loss of the former should not be considered as the income or loss of the latter in each of those years, and tax deficiencies were assessed against the North Jersey Title Insurance Company for the year 1924 in the amount of $1,063.10; 1925 for $1,153.-93; 1926 for $1,716.96; 1927 for $527.49; 1928 for $3,687.29; 1929 for $1,431.49; and as to the Belhall Company the sum of $390.72, for the year 1929.

A redetermination of these deficiencies was sought before the Board of Tax Appeals and the determination of the Tax Commissioner was affirmed by it. From that decision the petitioner appealed to this court in so far as the assessments against the North Jersey Title Insurance Company are concerned for the years 1924 to 1927, inclusive, and the year 1929, in the aggregate amount of $4,892.97, and for the year 1929, as to the Belhall Company, in the amount of $390.72.

The petitioners abandoned their proposition that the two companies were affiliated within the meaning of the applicable Revenue Acts, and rest their case upon the theory that the corporate identity of the Belhall Company may be disregarded and its gains or losses for the years involved be treated as the gains or losses of the North Jersey Title Company. As to this, the Board of Tax Appeals held as follows: "In the alternative petitioners assert that the income or loss of the Belhall Company should be considered as that of the Insurance Company for income tax purposes. The record is clear that for business purposes, primarily to preserve the very existence of the Insurance Company, the Belhall Company was organized and recognized as a separate and distinct corporation to own certain properties and assume certain liabilities with respect thereto. Upon this record, we conclude· that there was real substance in the organization and operation of the Belhall Company and not mere form or fiction as petitioners contend. There is no basis for a total disregard of the corporate entity of the Belhall Company and a holding that it constituted nothing more than a real estate department of the Insurance Company. We sustain the respondent's determination that the tax liability of each petitioner must be computed separately. Burnet v. Commonwealth Improvement Company, 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399."

It is difficult to reconcile this decision with the facts that gave rise to the birth of the Belhall Company which facts were apparently not only known to the stockhold-

ers of the Belhall Company who were vitally concerned as stockholders and officers of the insurance company, but by the supervising authorities of the state of New Jersey; namely, the banking and insurance department. This is evidenced by the testimony of Mr. Braverman, who said, according to the statement of facts in the record at page 68: "He is a certified public accountant and has been such for the past eighteen years; that during the years 1923 and 1924, he was the chief examiner of the Department of Banking and Insurance of the State of New Jersey; that during the summer of 1923 he was ordered to make a personal investigation of the affairs of the North Jersey Title Insurance Company, and to give particular attention to loans made on property at Mountain Lakes. It developed that there were thousands of fraudulent mortgages on which the North Jersey Title Insurance Company had advanced money, and on which it did not have the required security; that the matter was very fully discussed by him with the Chief Examiner of Banking and Insurance, and efforts were made to put the company into receivership; he recommended otherwise, and was sustained in his belief that if the company could in some form acquire title to the real estate it could work out its salvation in a few years; that it was agreed by the Banking and Insurance Commissioner that the property should not be taken over by the North Jersey Title Insurance Company as it would practically wreck the title insurance business in New Jersey to hear that the North Jersey Title Insurance Company had issued insurance policies against buildings that had never existed or purported to exist; that six or eight months later he was sent back to make another examination, and in the course of the examination he found that the North Jersey Title Insurance Company's executive committee had organized another company known as the Belhall Construction Company, later renamed Belhall Company, for the purpose of acquiring the title. He disapproved this for the reason that whereas the North Jersey Title Insurance Company had been imposed upon to a certain extent, still the land was valuable, and if it deeded it to another company such as the Belhall Company, the North Jersey Title Insurance Company was in a worse position than it was when he made his first examination; but he suggested to the president of the North Jersey Title Insurance Company and the counsel and those who had shares of stock, that they immediately transfer the Belhall stock to the North Jersey Title Insurance Company; that the question then arose that under the laws of the State of New Jersey then existing in Section 16 a, an insurance company could not own stock in a company which did not pay dividends, or had not paid dividends for five years, and the agreement was made that since it could not be transferred at any set time, that these directors, or the executive committee, would make a trust agreement and assign the stock to the North Jersey Title Insurance Company; that this was done; and that he reported back to the Banking and Insurance Commissioner, attaching a copy of the trust agreement to his report, which was acceptable. That he ceased being chief examiner July 1, 1926, and the North Jersey Title Insurance Company and the Belhall Company were starting their books, and retained his services as consultant; that the question then arose on the part of the departmental examination made by his successor whether for retrenchment purposes the stock should be transferred direct to the North Jersey Title Insurance Company rather than a trust agreement, in spite of the fact that that was the procedure recommended on his (the witness's) investigation. Mr. Zabriskie got in touch with him with the result that the Deputy Commissioner, Mr. C. A. Gough, had written him that the affairs of his company were not satisfactory, and that he wanted the officers to meet with the Commissioner in Trenton for the purpose of properly working out the salvation of the North Jersey Title Insurance Company. This happened in the latter part of 1928; that Mr. Zabriskie later advised him that their general counsel, Mr. Wendell Wright, had visited Mr. Gough, and that Mr. Gough suggested that these fourteen shares of stock be transferred so that outright ownership would be vested in the North Jersey Title Insurance Company; that this was done, and the North Jersey Title Insurance Company ordered this amount for the stock; that thereupon he (the witness) wrote Mr. Gough, the Deputy Commissioner, who had been his superior officer, and asked him if that was his understanding in view of the discrepancy in the law pertaining to investments; that Mr. Gough replied stating that on reviewing the recommendation that was so, and approved it in this case, but ruled that the $1,400 would not be allowed as an admissible asset."

It is true beyond any question that the insurance company was faced in 1923 with a very serious financial situation. By the rascality of its agents it was confronted by not only a very large monetary loss, but believed that a disclosure of its condition would unsettle the entire field of this form of financial enterprise in the state of New Jersey. As a means of coping with this situation, it incorporated this subsidiary company in which no third party had any stock or interest. It shouldered the financial responsibility of the company and the losses of it were its own.

The principle that substance and not form should control in the application of income tax law is fundamental. Fictional corporate camouflage cannot be made the device to escape taxation. On the other hand, equal equity demands that the creation of a subsidiary corporate structure with no purpose of evading tax but solely for the purpose of meeting the exigencies of a serious and possible fatal financial situation should not be regarded as the birth of a new entity completely unidentified with the former for taxing purposes, particularly under the peculiar circumstances surrounding the instant case.

In Southern Pacific Co. v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142, and Gulf Oil Corporation v. Lewellyn, 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133, corporate lines between parent and subsidiary corporations were disregarded to arrive at just taxing basis, although the holdings in these cases have been modified by the language of Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 53 S.Ct. 198, 199, 77 L.Ed. 399, as follows: "Southern Pacific Co. v. Lowe, supra, and Gulf Oil Corp. v. Lewellyn, supra (the latter covered in principle by the first), cannot be regarded as laying down any general rule authorizing disregard of corporate entity in respect of taxation. These cases presented peculiar situations, and were determined upon consideration of them. In the former this court said [247 U.S. 330, at page 338, 38 S.Ct. 540, 62 L.Ed. 1142]: 'The case turns upon its very peculiar facts, and is distinguishable from others in which the question of the identity of a controlling stockholder with his corporation has been raised. Pullman's Palace Car Co. v. Missouri Pacific Ry. Co., 115 U.S. 587, 596, 6 S.Ct. 194, 29 L.Ed. 499; Peterson v. Chicago, Rock Island & Pacific Ry. Co., 205 U.S. 364, 391, 27 S.Ct. 513, 51 L.Ed. 841.'"

The present case presents just such "peculiar circumstances." Here no question is raised between the identity of a controlling stockholder with his corporation. On the other hand, there is amply demonstrated a subsidiary corporation the only purpose of which was to act as agent for and on behalf of its parent, and while in form there are admittedly two separate entities, in substance there is but one enterprise.

The decision of the Board of Tax Appeals should be reversed.