RED CARPET CAR WASH, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LARRY LANGE FORD, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4829–77, 4830–77.    Filed January 10, 1980.

*Donald J. Forman* and *Michael D. Ginsberg,* for the petitioners.

*Joe K. Gordon,* for the respondent.

DRENNEN, *Judge:* In these consolidated cases, respondent determined the following deficiencies and additions to tax:

| Docket No. | Petitioner | Year | Deficiency | Addition to tax under sec. 6651(a), I.R.C. 1954[1] |
|---|---|---|---|---|
| 4829–77 | Red Carpet Car Wash, Inc. | 1974 | $1,684.96 | $421.24 |
| 4830–77 | Larry Lange Ford, Inc. | 1973 | 100,281.26 | --- |
| | | 1974 | 69,019.48 | 12,704.87 |

Petitioner Red Carpet Car Wash, Inc., has conceded the correctness of the respondent's determinations, thus leaving no issue for determination in docket No. 4829–77. Due to concessions by both parties in docket No. 4830–77, including petitioner Larry Lange Ford, Inc.'s concession of the section 6651(a) addition to tax for 1974, the issues for decision are (1) whether Larry Lange Ford, Inc., was the owner in 1973 and 1974 of a partnership interest in Rollingwood Apartments so as to entitle it to deduct an allocable share of the loss incurred by the partnership, and (2) whether petitioner Larry Lange Ford, Inc., under section 1561, is entitled to a greater portion of the section 11(d) surtax exemption for 1973 than that allowed by respondent in the statutory notice of deficiency.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, unless otherwise noted.

## FINDINGS OF FACT

Some of the facts were stipulated, and they are so found. The stipulation of facts and the stipulation of partial settlement, together with the exhibits attached thereto, are incorporated herein by this reference.

Larry Lange Ford, Inc. (hereinafter petitioner), is a corporation duly organized under the laws of the State of Iowa, having been incorporated in 1965. It had its principal place of business in Cedar Falls, Iowa, at the time its petition in this case was filed and at all other relevant times herein. During the years involved, petitioner operated a Ford automobile agency in Cedar Falls, Iowa.

Larry Lange (hereinafter Lange), is an individual who during 1973 and until November 1, 1974, was vice president of petitioner. Effective November 1, 1974, Lange became president of petitioner.

Richard J. Witham (hereinafter Witham) is an individual who during 1973 and until his resignation as of October 31, 1974, was president of petitioner.

During 1973, Lange and Witham owned all of the issued and outstanding shares of petitioner's common stock. On December 31, 1973, Lange owned 60 percent, and Witham owned 40 percent.

During 1973, petitioner enjoyed unprecedented sales and profits. As business increased, more money was needed to increase the parts inventory. Accounts receivable also increased, as did the used car inventory. As a result thereof, petitioner had a cash flow problem, although it had substantial profits. The existence of cash with which to run the business had always been a problem. Because of its profits in 1973, a potential income tax liability existed for payment of which petitioner did not have sufficient cash. This was the first year in which petitioner had profits such that it had to be concerned with its potential income tax liability.

As early as June 1973, Lange and Witham began considering the need for petitioner to invest in a tax shelter in order to reduce petitioner's income tax liability. In late June 1973, Lange contacted Raymond E. Howell (hereinafter Howell) about the possibility of a tax shelter investment for petitioner. When Lange and Howell first met, Howell recommended that Lange obtain the services of a good certified public accountant and tax attorney. Lange indicated that he was satisfied with the services

of petitioner's then-current accountant, Rob W. Henderson (hereinafter Henderson), but that he did not have a tax attorney. Howell recommended Reuben Ginsberg (hereinafter Ginsberg), and Howell obtained Lange's permission to discuss the tax shelter matter with Ginsberg. Ginsberg was not retained, however, by Lange as either his or petitioner's attorney.

Howell met with Ginsberg in July 1973 about the tax shelter. Prior to that time, Ginsberg had not heard of petitioner or Lange. Ginsberg discussed the tax shelter matter with Howell as a favor to Howell and, as it ultimately happened, *infra,* as a service to an existing client. At the July 1973 meeting, Howell outlined for Ginsberg the financial specifics of the type of tax shelter which Lange sought for petitioner; namely, an investment which would shelter approximately $200,000 of income for a $40,000 cash outlay and which would be viable with at least some possibility of a future return of equity. At that time, Ginsberg was unaware of any investment which satisfied those criteria. Following this first meeting and throughout the remainder of 1973, a number of tax shelter investment proposals were presented by petitioner's representatives to Ginsberg for his analysis and approval. Ginsberg rejected these proposals for various reasons.

In August 1973, a meeting was held between Lange, Witham, and Henderson. They discussed purchasing other automobile dealerships in Fort Worth, Tex., and Cedar Falls, Iowa.[2] They also discussed the formation of a new company which would be a holding company for any automobile companies owned or acquired by Lange and Witham. The new corporation was to be named T.I. Enterprises, Inc. (hereinafter Enterprises), and Henderson was to meet with an attorney concerning the formation of Enterprises.

At some time between September 12, 1973, and September 15, 1973, Henderson examined petitioner's monthly financial statements for the period January 1 through August 31, 1973. One purpose for the examination was to ascertain the adequacy of petitioner's quarterly estimated income tax payments, because the third quarter payment was due September 15. Based on the monthly financial statements, Henderson "annualized" petition-

---

[2]At the time, Lange, in addition to his ownership interest in petitioner, owned an automobile dealership in Dallas, Tex.

er's earnings for 1973 and determined that a substantial tax payment would be due for 1973. Henderson also determined that petitioner's projected tax liability would jeopardize petitioner's working capital. Following discussions with Lange and Witham, and based upon the assumption that petitioner would make an investment which would "shelter" $180,000 of income, Henderson recommended that the third quarter estimated tax payment not be made. Neither third nor fourth quarter estimated tax payments were made.

On September 17, 1973, Henderson met with an attorney concerning the formation of Enterprises as an Iowa corporation. Henderson reviewed with the attorney the purpose for which Enterprises was being organized and the details necessary for the formation of the new corporation. Henderson did not mention transferring the stock of petitioner to Enterprises or filing a consolidated return for petitioner and Enterprises.

Enterprises was organized on September 25, 1973, under Iowa law. The articles of incorporation provided: (1) The corporation was organized to have unlimited power to engage in or do any lawful act concerning any or all lawful business; (2) the corporation was authorized to issue 100,000 shares of common stock with $1 par value; (3) the initial registered office had the same address as petitioner; (4) the initial board of directors was to consist of Witham and Lange; and (5) the incorporator was Witham. From the date of its incorporation on September 25, 1973, through December 31, 1973, Enterprises did not actively carry on any trade or business functions, and it had no employees, no bank account, no funds, no capital, no assets, and no taxpayer identification number.[3] Moreover, during 1973, neither Witham nor Lange contributed any cash or property, or rendered any services, to Enterprises. Nor did either individual receive any stock in Enterprises, although it was intended that they be equal shareholders.

On December 10, 1973, Lange, Howell, and Ginsberg held a meeting to discuss a tax shelter investment for petitioner which Ginsberg had recommended. The recommended investment was in Rollingwood Apartments, Ltd. (hereinafter Rollingwood), a partnership which was constructing an apartment complex and

---

[3]Enterprises did not open a bank account until Mar. 25, 1974. The account was opened with an initial deposit of $1,000. Enterprises obtained a taxpayer identification number in 1974. Enterprises acquired ownership of some of petitioner's stock in July 1974.

was in need of cash. Ginsberg had represented one of the original two partners in Rollingwood since the project had begun, and he represented Rollingwood in 1973. At the time Ginsberg recommended Rollingwood to Lange as a suitable investment for petitioner, Ginsberg had information concerning the 1973 losses which the project was expected to incur. It was anticipated that the loss would be approximatley $547,000. Although Ginsberg did not represent Lange, Ginsberg felt compelled to explain to Lange the type of investment Rollingwood was and what Lange could expect. Ginsberg also explained that new partners would be entitled to participate in the profits and losses of the partnership for the entire year 1973, based upon a 4-to-1 ratio of loss to capital contributed by the various partners during 1973. Lange accepted the terms of the investment as set forth by Ginsberg and stated that he wanted to make an investment so that a $165,000 loss would be allocated to petitioner, and a $35,000 loss would be allocated to himself, based upon the previously discussed 4-to-1 ratio of loss to capital contributed. Ginsberg advised that an immediate downpayment of $10,000 would be required and that the balance should be paid before the end of the year.

During the December 10 meeting, Lange and Howell discussed the problems which could arise between petitioner and the Ford Motor Co., if petitioner reported the investment in Rollingwood. Petitioner would have to report the investment if the partnership interest were listed in petitioner's name. Not only did Ford Motor Co. "frown" on tax shelter investments, but also, the amount of the investment would reduce petitioner's working capital below the required minimum. If petitioner's working capital were found to be below the required minimum, Ford Motor Co. (or Ford Credit Co.) could, inter alia, require petitioner to increase its capital and/or terminate petitioner's line of credit. Either event could have led to petitioner's having to discontinue its business since it did not have the money to increase its working capital and it could not operate without the line of credit. Lange asked Ginsberg whether it made any difference if the partnership interest was recorded in a name other than petitioner's. When Ginsberg, based upon the assumption that Enterprises was an assumed name for petitioner, explained that it made no difference as a matter of law, Lange instructed Ginsberg to record the Rollingwood partnership

interest in the name of Enterprises in order to hide the nature of the investment from Ford Motor Co. Prior thereto, Ginsberg had not heard of Enterprises. Ginsberg did not question Lange as to the status of Enterprises, i.e., whether it was a corporation, sole proprietorship, etc.

At some time later in 1973, an amendment was executed to the partnership agreement originally entered into by the two partners in Rollingwood in order to admit five new partners. This amendment provided, inter alia: (1) That Enterprises and Lange individually were each to become partners; (2) that Enterprises was to make a $41,250 capital contribution and Lange one of $8,750; (3) that for 1973, the allocation of profits and losses from the partnership would be based upon the percentage which each partner's cash capital contribution in 1973 bore to the total cash capital contribution of all partners in 1973; and (4) that for 1974 and thereafter, Enterprises would have an 8.25-percent interest in the partnership and Lange, one of 1.75 percent. Lange signed the amended partnership agreement for Enterprises. The amendment was executed as of January 3, 1973.

Payment of the $50,000 total investment ($41,250 in Enterprises' name and $8,750 in Lange's name) was accomplished in the following manner. Pursuant to a telephone call from Lange on December 10, 1973, a check for $10,000 payable to Rollingwood was drawn on petitioner's checking account. Second and third checks, both dated December 31, 1973, one in the amount of $30,000 and one in the amount of $10,000, were also paid by petitioner directly to Rollingwood. Petitioner obtained the $40,000 paid by the first and second checks by using its used car inventory as security to borrow money. The remaining $10,000 was cash petitioner had. All three checks were cashed by Rollingwood.

Petitioner was on the Ford standard accounting system used by all Ford dealerships for reporting to the Ford Motor Co. The system included a chart of accounts and standard Ford financial statements prepared on a monthly basis. In addition, petitioner had a direct computer line to Ford Motor Co. Transactions were punched into the computer daily, and petitioner received computer printouts reporting its transactions 3 times a month. Petitioner accounted for the three checks as follows.

All three of the checks paid by petitioner to Rollingwood were

accounted for in the Ford standard accounting system by debiting petitioner's investment account and by crediting petitioner's cash account with a corresponding amount.[4] The investment account was listed on the asset side of the balance sheet contained on the monthly financial statement. The nature of the investment was not reflected in the account or by the account number. Only the dollar amount of the investment was reported.

In February 1974, a computer entry was made by which an $8,750 credit was made to petitioner's investment account, and a corresponding debit to petitioner's accounts receivable from Lange. This last entry was made to reflect Lange's liability for the amount paid by petitioner for Lange's partnership interest in Rollingwood.

In late March and early April 1974, Henderson began his yearend audit of petitioner in order to prepare petitioner's income tax return for 1973. It was during this period that Henderson became aware of petitioner's checks made payable to Rollingwood. Henderson was aware that an investment had been made in a tax shelter, but he was not aware of the name of the investment or the percentage interest acquired. Henderson also found that a Schedule K-1 (Form 1065), the form utilized to reflect a partner's share of income, credits, deductions, etc., in a partnership, had been prepared with Enterprises named as the partner.[5] The schedule reflected a loss of $156,970.94 allocable to Enterprises.[6] Lange told Henderson that Enterprises' name was used in order to avoid disclosing the investment to Ford Motor Co. Lange also told Henderson to do what was necessary to solve the problem created by having Enterprises' name on the Schedule K-1. Henderson decided to solve the problem by filing a consolidated return for petitioner and Enterprises and, thus, use the loss allocable to the partnership interest in Rollingwood to reduce petitioner's income.

A consolidated return for 1973 for petitioner and Enterprises was prepared by Henderson. On the return, a loss of $156,970.74 was reported as the result of the partnership interest in

---

[4]Petitioner also recorded in its investment account such things as stock purchases.

[5]The Schedule K-1 was prepared by the accountant for Rollingwood. Ginsberg rendered no advice as to the name to be used on the schedule.

[6]Rollingwood's 1973 partnership return was audited. Minor adjustments were made which reduced the partnership's net loss. The portion of the loss allocable to Enterprises was accordingly reduced. The parties did not stipulate or otherwise introduce evidence, however, concerning the loss petitioner would be entitled to deduct for 1973 if a decision is entered for petitioner.

Rollingwood. Henderson used an off balance sheet reporting procedure in not reporting the loss on petitioner's financial statements, thus preventing disclosure of the loss to the Ford Motor Co. No consent to allocate a single surtax exemption under section 1561 was filed with the 1973 consolidated return.

Enterprises did not acquire the requisite 80-percent control of petitioner for consolidated return purposes[7] until July 2, 1974. Enterprises did not receive, own, or hold any of petitioner's stock on December 31, 1973. Enterprises and petitioner were not members of an affiliated group and were not entitled to file a consolidated return for 1973.

For 1974, Rollingwood filed a partnership return on which was reflected a net loss of $193,078.58. The portion allocated to Enterprises was $57,923.58, which amount was recorded on the Schedule K–1 prepared in Enterprises' name.

A consolidated return for 1974 was filed for Enterprises, petitioner, and three other corporations, including Red Carpet Car Wash, Inc. On the return, a loss of $57,923.58 was reported from the interest in Rollingwood. The partnership interest and the loss were reflected on the return as belonging to Enterprises in order to comport with the Schedule K–1.

The consolidated return for 1974 was not received by respondent until February 10, 1976. The last day, including extensions, for filing a consolidated return for calendar year 1974 was August 15, 1975. The consolidated return for 1974 was not filed timely.

Respondent determined in the statutory notice of deficiency that petitioner and Enterprises were not entitled to file consolidated returns for 1973 and 1974, and petitioner has so conceded. The question is whether petitioner or Enterprises is entitled to deduct the loss allocable to the partnership interest in Rollingwood. The amount of the loss for each year was not put in issue. In the statutory notice, the respondent determined that Enterprises was entitled to the losses.

The second issue is whether petitioner is entitled to a greater surtax exemption for 1973 than allowed by respondent. In

---

[7]Secs. 1501 and 1504.

computing petitioner's liability for 1973, respondent allowed petitioner a surtax exemption of $8,333.34.[8] The parties stipulated that petitioner is entitled to a surtax exemption of $21,664.88 for 1974.

## ULTIMATE FINDING OF FACT

Petitioner was the owner of the partnership interest in Rollingwood for the years 1973 and 1974.

## OPINION

The first question to be decided is whether petitioner or Enterprises is the owner of the Rollingwood partnership interest in 1973 and 1974 so as to entitle it to deduct the loss allocable to that partnership interest. There is no dispute that Rollingwood incurred losses in both 1973 and 1974 and that the owner of the partnership interest is entitled to deduct the loss allocable to that partnership interest. In addition, the parties did not put in issue the amount of the loss allocable to the partnership interest.[9]

Respondent asserts that Enterprises was the record owner of the partnership interest, that a valid business purpose existed for the formation of Enterprises, and that Enterprises' corporate existence and record ownership cannot be ignored in determining which entity is entitled to the loss, citing *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943). Petitioner's argument is the familiar one of substance over form. Petitioner asserts that it is the beneficial owner of the partnership interest and is entitled to deduct the loss since it was the entity for which an investment was sought, it supplied the money with which the partnership interest was purchased, Enterprises did not conduct any business activities in 1973, and Enterprises' name was used solely to prevent the nature of the investment from being disclosed to Ford Motor Co.

The facts are not subject to dispute. It is clear that a tax

---

[8]In the revenue agent's report, prepared during the audit of petitioner's tax returns, petitioner was allowed a surtax exemption of $24,819.41 for 1973. The remaining $180.59 was allocated to L & M Advertising, Inc., and zero was allocated to T.I. Enterprises, Inc.

[9]Respondent did not contend that because petitioner or Enterprises did not become a partner in Rollingwood until December of 1973, neither of them was entitled to share in Rollingwood's losses for the entire year in accordance with the 4-to-1 formula prescribed by Ginsberg and set out in the amendment to the partnership agreement. See *Moore v. Commissioner,* 70 T.C. 1024 (1978).

shelter investment was sought for petitioner and that the investment in Rollingwood was intended for petitioner. Additionally, we are convinced that the partnership interest was listed in Enterprises' name solely to prevent Ford Motor Co. from discovering petitioner's involvement, although the amount of the investment was nonetheless reflected on petitioner's monthly financial statements.

Based on the foregoing, we conclude that Enterprises was a mere nominee whose name was used for a partnership interest which was beneficially owned by petitioner. Petitioner supplied the only item necessary for obtaining the partnership interest, the requisite capital contribution, while Enterprises made no contribution to the partnership or engaged in any type of activity with regard thereto. We do not believe that under these circumstances *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), requires that Enterprises be recognized as the owner of the partnership interest.

In reaching the above conclusion, we are not unmindful of the general rules that normally a corporation will be respected as a separate entity for tax purposes (*New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442 (1934); *Weigman v. Commissioner*, 47 T.C. 596, 604 (1967), affd. per curiam 400 F.2d 584 (9th Cir. 1968)), and that a taxpayer, having the freedom to structure his activities as he may choose, is bound by the consequences of that choice, including the tax disadvantages of utilizing a corporate structure. *Moline Properties, Inc. v. Commissioner, supra; Higgins v. Smith*, 308 U.S. 473 (1940). Furthermore, any demand by shareholders of a closely held corporation that the corporate structure be ignored must be closely scrutinized. *Strong v. Commissioner*, 66 T.C. 12 (1976), affd. 553 F.2d 94 (2d Cir. 1977).

However, the issue here is not whether Enterprises must be recognized as a separate taxable entity, but is who was the actual owner of the partnership interest. The fact that Enterprises had not been activated during 1973 simply adds weight to the argument that petitioner was intended to be and was the actual owner of the partnership interest. Unlike in some of the cases cited above, neither Lange nor petitioner utilized Enterprises to conduct any business activity or even to hold title to property. Here, Lange, acting on the spur of the moment upon the misunderstood advice from Ginsberg, simply utilized Enterprises' name to disguise petitioner's ownership of the partner-

ship interest. Lange gave no thought to Enterprises' corporate existence when he told Ginsberg to use Enterprises' name in the partnership agreement. Enterprises was nothing more than a nominee. Cf. *Paymer v. Commissioner*, 150 F.2d 334 (2d Cir. 1945), affg. in part and revg. in part a Memorandum Opinion of this Court; *Jackson v. Commissioner*, 233 F.2d 289 (2d Cir. 1956), affg. 24 T.C. 1 (1955).[10] It was never intended by anyone involved that Enterprises, rather than petitioner, should become the actual partner in Rollingwood. We do not believe that the mere use of Enterprises' name to avoid problems with the Ford Motor Co. equates with the election to use another corporation to carry out a transaction as was present in *Moline Properties* and other cases which have required recognition of the separate corporate entity.

In *Paymer*, one corporate attribute, i.e., that a corporation's property cannot be attached by its shareholders' creditors, was central to the formation of the corporation and the transfer to it of title to property. Nevertheless, the Second Circuit held that the corporation's existence need not be recognized for purposes of determining who was taxable on income from the property, because the corporation was a passive dummy which held mere legal title and conducted no activity with regard to the property. The Second Circuit in *Commissioner v. State-Adams Corp.*, 283 F.2d 395, 398 (2d Cir. 1960), revg. 32 T.C. 365 (1959), characterized the corporation in *Paymer* as "a mere nominee for furnishing a name for the land records." Enterprises was a nominee for furnishing a name for the partnership agreement. It did not negotiate for, nor agree to buy, the partnership interest, it did not pay for it, and there was no business, tax, or other reason for it to acquire the partnership interest in 1973, and it engaged in no activity with respect to the partnership interest.

The filing of 1973 and 1974 consolidated returns for petitioner and Enterprises does not alter our conclusion. These returns were prepared by Henderson under the mistaken belief that by filing consolidated returns, the allocable partnership loss could be used to offset petitioner's income. This does not change the fact that petitioner was the owner of the partnership interest.

[10]See also *North Jersey Title Ins. Co. v. Commissioner*, 84 F.2d 898 (3d Cir. 1936); *Steinmetz v. Commissioner*, T.C. Memo. 1973–208. Compare *Taylor v. Commissioner*, 445 F.2d 455 (1st Cir. 1971), affg. a Memorandum Opinion of this Court.

Accordingly, we have found as an ultimate fact that petitioner was the owner of the partnership interest in Rollingwood in 1973 and 1974 and conclude that it is entitled to deduct its allocable share of the partnership losses. In reaching this conclusion, we relied principally on the facts as they existed in 1973 when the partnership interest was acquired. Although Enterprises became a more active corporation in 1974, no evidence was introduced to indicate that its status, vis-a-vis the partnership interest, changed. Furthermore, neither party approached the issue involved as if factual distinctions existed for 1973 and 1974 so as to require a different result for the 2 years.

The second issue for decision is whether petitioner is entitled to a greater portion of the section 1561 surtax exemption for 1973 than that allowed by respondent in the statutory notice of deficiency. Corporations were entitled to a surtax exemption of $25,000 in 1973. Sec. 11(d).

For 1973, section 1561(a) provided:

(a) GENERAL RULE.—If a corporation is a component member of a controlled group of corporations on a December 31, then for purposes of this subtitle the surtax exemption of such corporation for the taxable year which includes such December 31 shall be an amount equal to—

(1) $25,000 divided by the number of corporations which are component members of such group on such December 31, or

(2) if all such component members consent (at such time and in such manner as the Secretary or his delegate shall by regulation prescribe) to an apportionment plan, such portion of $25,000 as is apportioned to such member in accordance with such plan.

The sum of the amounts apportioned under paragraph (2) among the component members of any controlled group shall not exceed $25,000.

The applicable regulatory provision for 1973 is section 1.1561–3A, Income Tax Regs.[11] Subparagraph (a)(2) describes the period in which the consent to an apportionment plan must be made:

A controlled group may adopt an apportionment plan with respect to a particular December 31 only if, at the time such plan is sought to be adopted, there is at least one year remaining in the statutory period (including any extensions thereof) for the assessment of a deficiency against any corporation the tax liability of which would be increased by the adoption of such plan. If there is less than one year remaining with respect to any such corporation, the district director with whom such corporation files its income tax return will ordinarily, upon request, enter into an agreement to extend such statutory

---

[11]Sec. 1.1561–0, Income Tax Regs.

period for the limited purpose of assessing any deficiency against such corporation attributable to the adoption of such apportionment plan.

Petitioner did not file, either with its consolidated return for 1973 or at any other time, a consent to an apportionment plan for the surtax exemption. In the statutory notice respondent, after determining that petitioner was not entitled to file a consolidated return, determined that petitioner was one of a controlled group of three corporations, and he allowed petitioner a surtax exemption of one-third of $25,000 ($8,333) in calculating the amount of the deficiency.

Petitioner does not dispute that for 1973 it was a member of a controlled group for purposes of section 1561. It does, however, advance two arguments in support of its claim to a greater portion of the single surtax exemption than allowed by respondent.

Petitioner's first contention is that it did not file a consent to an apportionment plan within the period specified in section 1.1561–3A(a)(2), Income Tax Regs., because of its reliance on the allocation of the single surtax exemption made in the revenue agent's report. In that report, dated March 19, 1976, $24,819.41 of the $25,000 surtax exemption was allocated to petitioner. Petitioner asserts that it was not until it received the statutory notice of deficiency that it knew of respondent's determination to allocate a lesser portion of the surtax exemption to petitioner. The statutory notice was mailed on February 16, 1977, a date petitioner claims was less than 1 year prior to the end of the statutory period for assessment of any deficiency against petitioner. Thus, petitioner argues, it did not have sufficient time to file a consent so that at least 1 year remained in the statutory period for the assessment of a deficiency. Petitioner claims that because the allocation contained in the revenue agent's report serves the same purpose as a valid consent to an apportionment plan, i.e., to inform the Internal Revenue Service of the unequal allocation and of the members of the controlled group, and because petitioner could not file a timely consent, the allocation of the surtax exemption contained in the revenue agent's report should be treated as a valid consent.

We are not persuaded by this argument.[12] While petitioner

---

[12]Petitioner misapplies the timing provision of the regulation when it argues that when the notice of deficiency was issued, it was too late to file its consent. The regulation provides that consents must

may have been misled by the revenue agent's report, this did not relieve petitioner of its affirmative obligation to adopt an apportionment plan and file consents thereto if it wanted to allocate the surtax exemption unequally between the members of the controlled group. Section 1561 specifically provides that the one surtax exemption allowed to members of a controlled group shall be divided equally among them unless all component members consent, "at such time and in such manner as the Secretary * * * shall by regulations prescribe," to an unequal apportionment plan. The Secretary did prescribe in section 1.1561–3A, Income Tax Regs., the time for adopting a plan (see subpar. (a)(2)), and the manner in which consents must be filed (see subpar. (b)(1)). Petitioner failed to comply with the regulation and cannot be excused by the fact that all the information required might have been available to respondent at the time the revenue agent's report was filed.[13]

Petitioner's alternative argument is that Enterprises, because of its lack of corporate activity, should not be counted as a member of the controlled group of corporations for purposes of equally dividing the surtax exemption and, thus, petitioner is entitled to one-half of the surtax exemption.

We agree with petitioner on this alternative argument, although we have found no cases dealing with this subject.[14] As of December 31, 1973, Enterprises had no assets and had engaged in no business activity. The purpose of the surtax exemption is to relieve a certain amount of corporate income from the surtax rates. To consider Enterprises as a component of the controlled group for purposes of allocating the surtax exemption would be defeating the purpose of the statute. We conclude that a corporation which existed in name only, had no assets, and engaged in no business activity will not be considered a component part of a controlled group for purposes of section 1561. Since we have no information with respect to L & M Advertising, Inc., and petitioner admits that it was a member of

---

be filed while there is at least 1 year remaining to assess a deficiency against any corporation, the tax liability of which would be *increased* by the adoption of the plan. Petitioner's tax liability was *reduced* rather than increased by the allocation it made. However, it may be that the tax liability of the other member of the controlled group, L & M Advertising, Inc., may have been increased by the allocation.

[13]See *Joseph L. Lecce, Inc. v. Commissioner,* T.C. Memo. 1974–112.

[14]See, however, *Allied Utilities Corp. v. Commissioner,* 64 T.C. 1024 (1975), which did require allocation of the surtax exemption to a corporation which was in existence for only 1 day, but there was no discussion of the corporation's business activities.

a controlled group, petitioner is entitled to one-half of the surtax exemption.

*Decisions will be entered under Rule 155.*