JOHN W. LEUTHOLD AND PAMELA LEUTHOLD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Leuthold v. Commissioner
Docket No. 1131-84.
United States Tax Court
T.C. Memo 1987-610; 1987 Tax Ct. Memo LEXIS 655; 54 T.C.M. (CCH) 1308; T.C.M. (RIA) 87610; December 15, 1987; As amended January 4, 1988 John W. Leuthold, pro se. Paul H. Weisman, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the years 1978 and 1979 in the amounts of $ 22,977 and $ 91,971, respectively, and an addition to tax for the year 1978 under section 6651(a) [1] in the amount of $ 5,872. After concessions, the issues for decision are (1) whether petitioners are entitled to claim a nonbusiness bad debt (or worthless stock) deduction of $ 256,563 with respect to advances made to a corporation, and (2) whether petitioners are entitled to claim an abandonment loss of $ 129,005 resulting from the expiration of an option in movie rights. *657 FINDINGS OF FACTS Some of the facts in this case are stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioners John Leuthold (Leuthold) and Pamela Leuthold resided in Flintridge, California, when they filed the petition. The issues in this case stem principally from Leuthold's interactions with the following motion picture production companies in which petitioners held interests: (1) Sun Productions, Inc., and its corporate division Sun Releasing, and (2) Labrys Productions, Inc., and its corporate predecessor Rancho Productions, Inc. (1) Sun Productions, Inc.
Leuthold, an investor by occupation, and Paul Nobert (Nobert), a motion picture producer, each owned 45 percent of the stock of Sun Productions, Inc. (Sun Productions), during the years 1973 through 1980. Throughout most of this period Leuthold and Nobert served as vice president and president respectively of Sun Productions. Leuthold and Nobert operated Sun Productions with the intention of acquiring and distributing the rights to various literary, television and motion picture properties. Sun Productions' tax returns for taxable years 1973 through *658 1980, which reflect the financial operations of it and its corporate division Sun Releasing, (collectively referred to as "the corporation"), indicate the corporation operated at a loss during each of those years. Its reported gross income and deductions for those years were as follows: Year
Gross Income
Deductions
1973
$   37
$ 79,500
1974
-0-
52,281
1975
-0-
20,659
1976
-0-
9,703
1977
26,756
80,705
1978
31,262
40,966
1979
-0-
1,829
1980
-0-
200
After 1973 the corporation was unable to obtain loans from outside lending institutions. The only outside loan that the corporation received was one that petitioners personally guaranteed. During these years, petitioners advanced the following sums to Sun Productions and Sun Releasing: Year
Sun Productions
Sun Releasing
1973
$ 122,500   --
1974
63,500   --
1975
40,200   --
1976
10,400   --
1977
3,100   $ 49,000
1978
1,165   24,450
1979
1,455   --
1980
500   --
Sun Productions and Sun Releasing used these funds to meet their continuing operating expenses. The advances were made by Leuthold's personal checks, *659 which generally included the notation "loan" and occasionally an interest rate. Petitioners' last advance to Sun Productions in 1979 was made in July. Sun Productions used the 1980 advances to pay its 1980 California franchise tax and accountant's fee for the preparation of the corporation's 1979 income tax return. Leuthold, Sun Productions and Sun Releasing never executed promissory notes with respect to the advances and never established formal maturity dates or repayment schedules for the repayment of the funds to petitioners. Sun Productions and Sun Releasing neither paid interest nor were required to pay interest for the use of the funds. Neither Sun Productions nor Sun Releasing provided petitioners with any form of security, any collateral, or any deed of trust from which petitioners could seek recovery in the event petitioners' advances were not repaid. Sun Productions and Sun Releasing did return the following amounts of the advances to petitioners during the following years: [2]
Year
Sun Productions
Sun Releasing
1973
$   2,500    --
1974
-0-     --
1975
7,550    --
1976
2,850    --
1977
15,150    --
1978
5,950    $ 2,500
*660 In 1977 Sun Productions made a valid small business corporation election. Sun Productions subsequently qualified as a small business corporation for tax purposes for the taxable years 1978, 1979, and 1980. During 1979 Nobert suffered injuries from an automobile accident which left him temporarily incapacitated. Thereafter, Leuthod assumed the position of president of Sun Productions. At some point during the year, however, petitioners became financially unable to continue advancing funds to the corporation. Within the year, Leuthold expressed to Gary Finkel (Finkel), the accountant to the corporation and petitioners personally, petitioners' desire to get out of the business. On petitioners' tax return for 1979, petitioners claimed a nonbusiness bad debt deduction of $ 185,663 with respect to the advances made to Sun Productions and a nonbusiness bad debt deduction of $ 70,900 with respect to the advances made to Sun Releasing. Petitioners filed the 1979 return *661 on October 15, 1980. Petitioners never requested repayment of the advances from Sun Productions and Sun Releasing and never pursued any legal action to recover the funds from the corporation. Sun Productions indicated on its 1980 tax return that it had written off all of its assets, amounting to $ 80,271, during 1980. Sun Productions' only deduction on the 1980 return was for the payment of the 1980 California franchise tax. In April 1981 Leuthold closed the bank accounts of Sun Productions and Sun Releasing. Sun Productions failed to pay California's annual franchise tax for 1981 and the years following. Consequently, in October 1982 California's Secretary of State suspended Sun Productions' corporate powers, rights, and privileges under California law. The corporation's consolidated balance sheets filed with its Federal income tax returns for the years 1973 through 1980 reflect the following: ASSETS
1973
1974
1975
1976
Current assets
$ 14,946 $ 5,655 $ 3,787 $ 3,581 Investments
Literary Properties
29,500 29,500 29,500 29,500 Motion Pictures
5,229 16,214 26,192 26,192 Television Properties
20,629 20,629 20,651 20,651 Other assets
2,609 2,330 1,951 1,672 Total assets
$ 72,913 $ 74,328 $ 82,081 $ 81,596 LIABILITIES AND
SHAREHOLDERS' EQUITY
Current Liabilities
$ 52,356 $ 226,439 $ 56,309 $ 57,977 Loans from Shareholders
120,000 --   198,750 206,300 Capital
55,500 55,500 55,500 55,500 Retained Earnings
(154,943)
(207,611)
(228,478)
(238,181)
Total liabilities and
Stockholders' Equity
$ 72,913 $ 74,328 $ 82,081 $ 81,596 *662 ASSETS
1977
1978
1979
1980
Current assets
$ 5,548 $ 3,388 $ 3,393 $      Investments
Literary Properties
29,500 29,500 29,500 Motion Pictures
26,192 26,192 26,192 Television Properties
20,651 20,651 20,651 Other assets
1,293 914 535 Total assets
$ 83,184 $ 80,645 $ 80,271 $  -0- LIABILITIES AND
SHAREHOLDERS' EQUITY
Current Liabilities
$ 77,778 $ 67,778 $ 67,778 $      Loans from Shareholders
243,250 260,415 261,870 Capital
55,500 55,500 55,500 Retained Earnings
(238,214)
(238,214)
(238,214)
Shareholders' undistributed
taxable income previously
taxed
(55,130)
(64,834)
(66,663)
Total liabilities and
Stockholders' Equity
$ 83,184 $ 80,645 $ 80,271 $  -0- In his notice of deficiency, respondent disallowed petitioners' 1979 nonbusiness bad debt deductions with respect to the advances to Sun Productions and Sun Releasing. (2) Labrys Productions, Inc.
In July 1974 petitioners formed Rancho Productions, Inc. (Rancho Productions), retained all of its corporate stock, and elected to treat it *663 as a small business corporation for tax purposes. Following the reorganization of Rancho Productions in 1977, the corporation operated under the name Labrys Productions, Inc. (Labrys Productions), and petitioners' shareholder interest in the corporation decreased to 50 percent. Through the year in issue petitioners continued to own 50 percent of the Labrys Productions stock and to treat it as a small business corporation. In late 1974 Rancho Productions acquired from Sun Productions an option to purchase the movie rights to the book "Killer" (the option). Thereafter, Rancho Productions and Labrys Productions approached studios about financing the production of a movie based on "Killer." To retain the option, Rancho Productions and Labrys Productions paid the owners of the movie rights to "Killer" the following amounts during the following years: Year
Amount
1974
$    500
1975
15,000
1976
20,000
1977
30,000
1978
20,000
1979
750
From 1974 through 1979 petitioners advanced the following amounts to Rancho Productions and Labrys Productions for their operating expenses: Year
Amount
1974
$ 23,300
1975
59,600
1976
33,600
1977
26,400
1978
26,700
1979
750
*664 In January 1975 Rancho Productions returned $ 13,300 to petitioners. On its tax returns Labrys Productions treated a substantial portion of petitioners' advances as loans from shareholders. No promissory notes were issued in relation to the advances. Rancho Productions and Labrys Productions were not required to and did not pay interest with respect to the advances. In early 1979 Labrys Productions abandoned its efforts to finance the production of "Killer." In February 1979 Labrys Productions failed to send the owners of the movie rights to "Killer" the renewal documents and payment for an extension of the option. Consequently, the option expired in March 1979. Labrys Productions' last payment on the option was made on July 10, 1979, after the option had lapsed. The balance sheet included with Labrys Productions' 1979 tax return implies that Labrys Productions transferred the option to petitioners in return for a discharge of Labrys Productions' indebtedness to petitioners. With respect to the asset "Deferred production costs," costs attributable to holding the option, Labrys Productions reported beginning and ending balances of $ 142,862 and $ 0, respectively. With respect *665 to the liability "Loans from stockholders," Labrys Productions reported beginning and ending balances of $ 122,950 and $ 0, respectively. No other written document was prepared to indicate such transfer. Petitioners took no action to renew the option. Petitioners themselves never made any direct payments to the owners of the movie rights to "Killer" before or after the option expired to keep the option in effect, and they did not renew Labrys Productions' efforts to finance the production of the movie. On their tax return for 1979, the year in issue, petitioners claimed an abandonment loss of $ 129,005 resulting from the expiration of the option in the movie rights to "Killer." Petitioners treated the expiration of the option on their return as a long-term capital loss. Labrys Productions ceased active operations between 1980 and 1981. In his notice of deficiency, respondent disallowed petitioners' 1979 deduction for the expiration of the option. OPINION I. Nonbusiness Bad Debt Deduction
The first issue for decision is whether petitioners are entitled to a nonbusiness bad debt deduction in the taxable year 1979 with respect to all funds advanced to Sun Productions *666 and Sun Releasing. Respondent argues that petitioners are not entitled to the nonbusiness bad debt deduction because the advance to Sun Productions and Sun Releasing were capital contributions rather than loans. Alternatively, if these advances were bona fide loans, respondent contends the deduction should be denied because petitioners have failed to prove they were worthless in 1979. Petitioners contend that the advances were in fact loans, as indicated by the following: (1) the advances were denominated as loans on petitioners' personal checks to Sun Productions and Sun Releasing and on the deposit slips of each business, (2) the advances were treated as loans on Sun Productions' balance sheets, (3) the advances were in part repaid in the form of "return of loan," and (4) petitioners' advances had no effect on their ownership of stock or control of the corporation. Petitioners also contend the "loans" were bona fide because they were made with the expectation of repayment. Furthermore, petitioners contend the alleged loans were worthless in taxable year 1979 because Sun Productions ceased operations in that year. Section 166(d) allows a deduction for nonbusiness debts *667 that become worthless during the taxable year; the loss resulting therefrom is considered a loss from the disposition of a capital asset held short term. The amounts claimed by petitioners are deductible only if the unrepaid advances are shown to be bona fide loans and not capital contributions. Section 166; section 1.166-1(c), Income Tax Regs.
In determining whether advances constitute loans or capital contributions, we generally focus on the substance, or economic reality, of a transaction and not its form. Hardman v. United States827 F.2d 1409, 1411 (9th Cir. 1987); Schnitzer v. Commissioner,13 T.C. 43, 60-61 (1949), affd. per curiam 183 F.2d 70 (9th Cir. 1950). To this effect one court has stated: Under an objective test of economic reality it is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender, and if the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only. [Fin Hay Realty Co. v. United States,398 F.2d 694, 697 (3d Cir. 1968).] In cases where the parties to *668 the advances are related, such as petitioners and Sun Productions, certain formalities usually respected in arm's-length transactions are sometimes ignored. See Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377-378 (1973). The absence of promissory notes and other such formalities is relevant although not determinative, and courts look to other factors and evidence to decide whether the substance of a transaction is as the taxpayer claims. Courts identify and consider a variety of criteria for determining whether a shareholder's advance is debt or equity. See Segel v. Commissioner,89 T.C. 816, 827 (1987); Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980). The Ninth Circuit Court of Appeals, to which an appeal in this case would lie, lists eleven factors which must guide our resolution of the debt-equity issue: [3]
(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce payment of principal and interest; (5) participation and management; (6) a status equal to or inferior to that *669 of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions.
Hardman v. United States,827 F.2d at 1411-1412; A. R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970). In Dixie Dairies Corp. v. Commissioner,74 T.C. at 493-494, we described the various factors and their purpose as follows: The identified factors are not equally significant * * *, nor is any single factor determinative. * * * Moreover, due to the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not relevant to each case. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." Estate of Mixon v. United States, [464 F.2d 394, 403 *670 (5th Cir. 1972] * * * "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporation venture or represents a strict debtor-creditor relationship." Fin Hay Realty Co. v. United States, supra at 697. As expressed by this Court, the ultimate question is "Was there a genuine intention to credit a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377 (1973). We agree with petitioners that the advances bear some resemblance to bona fide loans. Petitioners' advances were not proportionate to and did not increase their ownership of or control in Sun Productions. Although petitioners did not execute any documents, such as notes or stock certificates, which would give formal denomination to the advances, Leuthold contemporaneously wrote "loan" on most of his personal checks to Sun Productions and Sun Releasing. Nevertheless, the evidence *671 with respect to the remaining factors preponderates in favor of the respondent, as follows. The absence of a fixed maturity date indicates that repayment is tied to the fortunes of the business and that the advances are capital in nature. Hardman v. United States, 827 F.2d at 413. The advances in this case provided neither a fixed maturity date nor a fairly certain event to which repayment would be tied. The advances were made without any guarantee of repayment in any amount at any time. With respect to the source of the corporation's repayments, if repayment is not dependent upon earnings the advances resemble debt. See Hardman v. United States, supra. At first glance, Sun Productions' and Sun Releasing's repayment scheme suggests the advances were loans because their repayments were made in years in which the businesses had no earnings. We are not persuaded, however, that the source of the businesses' repayments indicate the advances were in fact loans. The corporation did not operate profitably in any year between 1973 and 1979, the year in issue, and it had meaningful revenue in only 2 of those 7 years. Moreover, neither of the other shareholders *672 contributed additional capital during this period. In addition, the repayments were not made in accordance with a repayment schedule. In reality, petitioners themselves were the source of the corporation's repayments by consistently providing funds which the corporation needed to make payments on the alleged debts as well as operating expenses. The advances were in effect "the fortunes" of the business upon which repayment was dependent. Furthermore, petitioners assert in their brief that repayments were made "when it was possible through revenues." The presence of the right to enforce the payment of principal and interest supports a finding that the advances were loans; conversely, the absence of such right indicates the advances were contributions of capital. See Hardman v. United States, supra. The record provides no indication that petitioners had the right to enforce such payments. Petitioners did not receive or request any collateral or security in return for the loans and did not execute any document reflecting a right of enforcement. The intent of the parties to the advances, as indicated by the objective facts, also supports respondent's position. We are persuaded *673 that petitioners did not extend bona fide loans with a reasonable expectation of repayment, as indicated by the following objective facts: (1) the bulk of petitioners' advances to Sun Productions were made during the early stages of the corporation's operations, (2) petitioners failed to execute any promissory notes with respect to the advances, (3) the alleged "loans" included no maturity dates, no security or collateral provisions, or any other terms which were favorable to petitioners and which would indicate the existence of a bona fide loan, and (4) petitioners never received any interest payments on the advances. Thin capitalization, as reflected by a high ratio of debt to equity, suggests that an advance is a capital contribution. Hardman v. United States,827 F.2d at 1414. Sun Productions and Sun Releasing were thinly capitalized at all relevant times. The corporation regularly experienced losses, and according to Sun Productions' balance sheets, the stockholders' equity in Sun Productions was actually a negative figure in each year through 1979. Finally, inability to obtain loans from outside lending institutions is an indication that advances are *674 capital in nature. Hardman v. United States, supra. At all relevant times Sun Productions and Sun Releasing were by themselves unable to obtain financing from other sources, and certainly unable on the same or similar terms as petitioners' alleged loans. In consideration of all the relevant evidence, we believe petitioners have failed to prove that their advances to Sun Productions and Sun Releasing were loans; thus, they are not entitled to bad debt deductions with respect to their advances. Consequently, we need not address respondent's alternative argument that, if the advances were in fact bona fide loans, they were not worthless during the year in issue. In fairness to petitioners, however, although they have not raised the issue, we have also considered whether the advances were deductible as worthless stock in the year in issue. Section 165(g)(1) [4] provides capital loss treatment for securities which are capital assets and which become worthless during the taxable year. See also section 1.165-5(c), Income Tax Regs. No deduction is allowed under section 165 unless the security becomes wholly worthless, and "[a] mere shrinkage in the value of stock owned by the *675 taxpayer, even though extensive, does not give rise to a deduction * * * if the stock has any recognizable value on the date claimed as the date of loss." Section 1.165-4(a), Income Tax Regs.
It appears that the corporation ceased operations as a going concern in 1979. Leuthold communicated to Finkel in 1979 his desire to abandon the business, petitioners stopped advancing funds to the corporation for operating expenses in July of that year, and the corporation had no revenue in 1979 or thereafter. The minimal corporate activity occurring after 1979 was not characteristic of an on-going concern. See Eagleton v. Commissioner,97 F.2d 62 (8th Cir. 1938), affg. 35 B.T.A. 551 (1937). *676 Cessation of operations in itself, however, does not establish worthlessness of stock where a corporation has liquidation value, i.e., where a corporation's assets, properly valued, exceed liabilities. Sun Productions' balance sheet for the end of 1979 reported total assets of $ 80,271 and total liabilities of $ 329,648, including, however, advances that we have found to be capital contributions rather than loans. Thus, the corporation's liabilities in 1979 were $ 73,085, consisting of current liabilities ($ 67,778) and shareholder loans other than petitioners' alleged loans ($ 261,870 - $ 256,563). Respondent argues that Sun Productions had liquidating value in 1979 because the book value of its assets, $ 80,271, exceeded its actual liabilities. Petitioner does not specifically address this point. The critical question at hand is whether the actual value of the corporation's assets exceeded its actual liabilities at the end of 1979. [5] The book value of a corporation's assets is merely evidence of the actual value and may be refuted by other evidence. Aagaard v. Commissioner,56 T.C. 191, 209 (1971); Friedlaender v. Commissioner,26 T.C. 1005, 1018-1019 (1956). *677 The record provides no evidence from which we can determine the market value of the assets to be less than either the total book value or $ 73,085, the amount of recorded liabilities, during the year in issue. The record provides no independent appraisal or specific testimony as to the value of the assets for 1979. We cannot conclude, therefore, that petitioners' Sun Productions stock was worthless in 1979. [6]
Issue 2 -- Deductions Attributable to Expiration of Option
Respondent argues that petitioners are not entitled to claim a loss of $ 129,005 with respect to the expiration of the option to purchase the movie rights to "Killer" on their 1979 income tax return because petitioners did not own the option at the time it expired. Alternatively, respondent, citing provisions relating to expired option losses, [7] argues that the petitioners *678 are not entitled to the deduction because petitioners did not personally engage in a trade or business with respect to the expired option and did not seek its acquisition to make a profit. Respondent concedes on brief, however, that petitioners are entitled to claim on their 1979 income tax return a section 1231 pass-through ordinary loss deduction of 50 percent of Labrys Productions' loss on the expiration of the option, or $ 43,125. Petitioners argue, without citing any authority, that they are entitled to a deduction for an abandonment loss of $ 129,005, because they were the owners of the option and thus sustained the loss. In support of this argument, petitioners contend that Labrys Productions properly transferred the option to petitioners in 1979 in return for a discharge of Labrys Productions' alleged debt to petitioners, purportedly amounting to $ 129,005. Petitioners contend this transfer served a business purpose by ridding Labrys Productions of all shareholder debts to make its balance sheet more attractive to potential investors. Petitioners alternatively argue that the loss, if sustained *679 by the corporation, should be attributed to them for tax purposes because their advances were substantively payments on the option and had no bearing on any other corporate project or the structure of ownership of the company's stock. Generally, a loss is deductible only by the taxpayer who sustains it. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440-441 (1934). A taxpayer who deducts losses with respect to property must be the owner of that property or an interest therein. Red Carpet Car Wash, Inc. v. Commissioner,73 T.C. 676, 684-687 (1980); accord Draper v. Commissioner,15 T.C. 135 (1950). In order to claim a loss from the failure to exercise an option, a taxpayer must establish that he owned the option for which he has claimed a loss at the time the loss occurs. Cf. Malden Knitting Mills v. Commissioner,42 T.C. 769, 777 (1964) (loss not allowed under the option loss provisions because taxpayer did not own an option). Losses derived from the failure to exercise an option occur on the date the option expires. Section 1234(a)(2). The taxpayer carries the burden of proving a deductible loss and its *680 amount. Burnet v. Houston,283 U.S. 223 (1931); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioners have failed to carry their burden of etablishing that they owned the option in "Killer" prior to its expiration. The evidence in their favor, a mere notation in Labrys Productions' balance sheet filed with its 1979 tax return, is scant. Leuthold testified that the alleged transfer of the option in "Killer" did not occur until after the option had expired. Finkel, who was aware of the tax benefits which would inure to petitioners if the option were treated as having been owned by petitioners rather than Labrys Productions when it expired, testified that he generally advises shareholders of closely held corporations to prepare written documentation of asset transfers involving their corporations. Nevertheless, neither he nor petitioners prepared any documentation of the alleged transfer. Labrys Productions made the only 1979 payment on the option, occurring in July 1979 after the option had lapsed, and petitioners never made any direct payments to the owners of the movie rights to preserve the option rights. There is no evidence suggesting that *681 petitioners were obligated to advance funds to maintain the option, that petitioners enjoyed particular rights or benefits with respect to the option for having made the advances, or that petitioners retained any other burdens or benefits of ownership either before or after the option expired. We also reject petitioners' alternative argument that, if Labrys Productions incurred the loss resulting from the expiration of the option, the total loss should be attributed to the petitioners. Generally, we treat a corporation as a separate taxable entity, and thus deny shareholders' claims for deductible losses incurred by the corporation, where the corporation is formed for a business purpose, such as investment or profit, or carries on a business purpose after incorporation. Moline Properties, Inc. v. Commissioner,319 U.S. 436, 438-439 (1943); Betson v. Commissioner,802 F.2d 365, 368 (9th Cir. 1986); affg. in part and revg. in part on another issue a Memorandum Opinion of this Court. The degree of corporate business purpose or the quantum of business activity required for recognition of the corporation as a separate taxable entity is minimal. Hospital Corp. of America v. Commissioner,81 T.C. 520, 579-580 (1983); *682 accord Buono v. Commissioner,74 T.C. 187, 197 (1980). Rancho Productions and Labrys Productions, despite their ultimate failure in business, were formed for a business purpose and carried on a business purpose through the year in issue. There is no justification for disregarding their separate existence. Because of our determinations, it is unnecessary to address respondent's alternative argument that petitioners did not acquire the option in a trade or business or in a transaction entered into for profit. To reflect the concessions, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the year remaining in issue (1979). ↩
2. Petitioners' advances to the corporation, minus the corporation's repayments shown in this table, equal an amount greater than petitioners' bad debt deductions; thus there may have been additional repayments. ↩
3. See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985↩ (10th Cir. 1971). 4. Section 165(g) provides in relevant part as follows: (g) Worthless Securities. -- (1) General rule. -- If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security defined. -- For purposes of this subsection, the term "security" means -- (A) a share of stock in a corporation; ↩
5. Compare our holding in Wildes v. Commissioner,T.C. Memo. 1980-298↩, where we found a corporation had liquidating value after we recharacterized certain alleged loans to the corporation as capital contributions. 6. Petitioners may, of course, be entitled to a deduction in a later year. See section 6511(d)(1). ↩
7. See sections 1234(a), 165(c); section 1.1234-1(f), Income Tax Regs.↩